OPAL BLOOMQUIST v. WOODLIEF THOMAS AND ANOTHER.
ALPHAMAE HALVORSON, ALSO KNOWN AS ALPHAMAE BLOOMQUIST, APPELLANT.[1]

April 16, 1943.

No. 33,292.

[1]Reported in 9 N. W. (2d) 337.

*George I. Weasler, Sidney Benson,* and *Philip Neville,* for appellant.

*Frank J. Collins,* for respondent.

YOUNGDAHL, JUSTICE.

On June 2, 1941, upon the petition of George Bloomquist, now deceased, the district court made and entered its order annulling and setting aside the marriage contract entered into on September 23, 1940, between him and Opal Bloomquist, hereinafter referred to as respondent. The present action was commenced by respondent to vacate and set aside the decree of annulment and to reëstablish her marital status as the surviving widow of decedent. The lower court made findings of fact, conclusions of law, and order for judgment granting the relief sought by respondent. Defendant Alphamae Halvorson, whom decedent married after the annulment decree was entered, moved in the alternative for amended findings or a new trial and appealed from the order denying her motion.

Following an acquaintance of some four years, respondent and George Bloomquist were legally married in Northwood, Iowa, on September 23, 1940. At the time of the marriage respondent and her sister shared and maintained an apartment, and decedent then occupied quarters in the immediate neighborhood. After the marriage each continued to maintain a separate domicile, except that decedent began contributing to household expenses at respondent's apartment. He had many of his meals there and spent considerable time with her in the evening, often remaining all night. The

evidence establishes without question the continued cohabitation of the parties as man and wife. This mode of living seems to have continued with little change until the following December. On December 20, 1940, decedent, as plaintiff, instituted an action against respondent herein for an annulment of their marriage, and on that date service of summons and complaint was made upon respondent at her home and in decedent's presence. It appears, however, that a reconciliation was effected immediately, and the two continued to live as husband and wife under the same conditions as had existed previously. The parties continued to cohabit as man and wife until May 25, 1941. Respondent made no inquiry as to the status of the annulment proceedings and apparently believed that they had been abandoned by decedent. On May 25, 1941, after having breakfast together, decedent left respondent's apartment, stating that he would return in the evening. He did not return, and on May 26 and 29, 1941, without respondent's knowledge, he testified on his own behalf in district court in the pending annulment proceedings and on June 2, 1941, was granted a default decree vacating and setting aside the marriage. The perjury committed by decedent in this proceeding is not seriously disputed. He testified that he was intoxicated at the time of the marriage, and his principal reason for the annulment was that respondent encouraged him to drink intoxicating liquor. There was sufficient evidence adduced at the trial to set aside the annulment proceedings to establish beyond question that decedent committed rank perjury at the annulment hearing.

A few days after the decree of annulment was granted and on June 15, 1941, decedent and defendant Alphamae Halvorson were married. They lived together as husband and wife until July 7, 1941, when decedent met death by drowning. Respondent was not apprised of decedent's marriage to Alphamae until she read of his death in the local newspapers. She began this action immediately to vacate and set aside the annulment decree.

It appears that prior to decedent's respective marriages to respondent and to Alphamae an antenuptial agreement was executed

in each case providing, in substance, that the separate property of the parties should remain as such and not be affected by the marriage contract.

Alphamae, the appellant here, contracted marriage with decedent without knowledge of the annulment proceedings or the fact that decedent and respondent had been married. There are no children as a result of either marriage. Our determination here will establish whether Alphamae or respondent is the surviving widow and heir at law of decedent, and hence entitled to whatever property he possessed at the time of his death.

The various assignments of error present two principal questions. for review, *viz.:*

(1) Was there sufficient evidence to establish the court's finding of extrinsic fraud under Minn. St. 1941, § 548.14 (Mason St. 1927, § 9405) ?

(2) What are the equities of the parties under the foregoing statute as related to the facts here presented?

■ A considerable portion of appellant's brief is devoted to a. discussion of intrinsic fraud. She frankly concedes that the evidence justifies a finding of perjury on decedent's part in the annulment proceedings, but discusses many cases holding that such perjury constitutes intrinsic fraud and is not available as a ground for setting aside a judgment under § 548.14, *supra*. With this we are in entire accord. Nor does respondent urge here that intrinsic fraud by reason of decedent's perjury committed at the annulment proceedings is available as a ground to set aside the judgment. It is well established that such perjury is intrinsic fraud and is. not available to set aside a judgment either under § 548.14, *supra*,. or at common law in the absence of such a statute, where the pleadings clearly inform the opposing litigant what will be attempted to be proved. Hass v. Billings, 42 Minn. 63, 43 N. W. 797; McElrath v. McElrath, 120 Minn. 380, 139 N. W. 708; Murray v. Calkins, 191 Minn. 460, 254 N. W. 605; In re Estate of Jordan,. 199 Minn. 53, 271 N. W. 104; United States v. Throckmorton, 98.

U. S. 61, 25 L. ed. 93.

Therefore, even though it appears from the evidence in this case that decedent was guilty of perpetrating perjury of a most despicable type in the default annulment proceedings, yet that is not a permissible basis for setting aside the judgment.

■ Respondent relies upon extrinsic fraud to set aside the judgment under said § 548.14, which provides, insofar as is here important, as follows:

"Any judgment obtained in a court of record by means of perjury, * * * or any fraudulent act, practice, or representation of the prevailing party, may be set aside in an action brought for that purpose by the aggrieved party in the same judicial district within three years after the discovery by him of such perjury or fraud. In such action the court may either enjoin the enforcement of the judgment or command the satisfaction thereof, may compel the party procuring the same to restore any property received by virtue thereof, and may make such other or further order or judgment as justice shall require; but no right or interest of a third party acquired under such judgment in good faith, and without knowledge of the wrong complained of, shall be affected by the action herein provided for."

Appellant asserts that the evidence does not sustain the finding of extrinsic fraud; that there is no showing that respondent was lulled into believing that the annulment proceedings had been abandoned. Respondent maintains that the testimony indicates a definite abandonment and that decedent surreptitiously and fraudulently secured the order of annulment. On appeal from an adverse decision of a trier of fact, we follow the well known rule that the testimony must be considered in the light most favorable to the prevailing party. Merritt v. Stuve, 215 Minn. 44, 57, 9 N. W. (2d) 329. In reviewing the evidence, we find reasonable support therein for the court's finding of extrinsic fraud.

The summons and complaint in the annulment proceeding were served on respondent on December 20, 1940, at the place where

the parties had been cohabiting as man and wife. Decedent was present when the process server arrived and apparently was aware in advance as to his time of arrival. The evidence shows that after the service the parties "cried all night." That would seem to indicate a mutual regret for the step that had been taken. At any rate, after the service of the process there was no change whatever in their manner of living. They continued to have sexual relations with each other and to cohabit as man and wife. It was to decedent's advantage, of course, to prevent, if possible, respondent's seeking advice as to a possible defense to the action. He well knew his complaint was founded on rank perjury, and he also, no doubt, was aware of the fact that it would have no standing in court if a contest should ensue. The only possible way for him to prevail under such a perjured foundation of fact was to induce respondent to believe that no steps would be taken to prove his purported cause of action and that the action had been abandoned. The evidence bears out the fact that such was his scheme and plan. After the summons was served, he went fishing with respondent, shopped for furniture, attended a birthday party with her, purchased an accordion for her at a cost of $150, discussed the matter of having children, talked with her sister about having a place in the country so that the father could be with them, bought her a Christmas gift, supplied medical attention, and they continued to live together as man and wife exactly as they had done prior to the service of the summons. Respondent prepared decedent's meals and did washing and ironing for him. Nothing was mentioned between the parties after December 20 about the annulment action. Respondent took no steps to protect her rights, apparently laboring under the conviction that nothing further would be done about it. Then on May 25, 1941, without any apparent difficulty occurring between the parties and after having breakfast together, decedent left respondent's home, stating he would be back that evening. He never returned.

Decedent, who had become acquainted with appellant in December 1940, began taking her out the first week in April 1941, and

was, without respondent's knowledge, making plans for his third marital venture. He went before the court on May 26, 1941, in the default annulment proceeding, and through vicious perjury secured an order annulling his marriage to respondent. Shortly thereafter, on June 15, 1941, he married appellant, and they lived together 22 days before he was drowned on July 7, 1941.

After giving due consideration to the important facts bearing on the issue of extrinsic fraud, it seems clear that the testimony amply supports a conclusion that decedent encouraged and induced respondent to believe that the annulment proceedings had been abandoned and that he prevented her thereby from taking any steps to defend her rights and to have her day in court. We do not overlook the rule expressed in 2 Dunnell, Dig. & Supp. § 2799(b), that the evidence of extrinsic fraud must be clear and convincing, when we hold that there is ample support for the court's finding of extrinsic fraud. Brockman v. Brockman, 133 Minn. 148, 157 N. W. 1086; Murray v. Calkins, 191 Minn. 460, 254 N. W. 605; McElrath v. McElrath, 120 Minn. 380, 139 N. W. 708, 44 L.R.A.(N.S.) 505; and United States v. Throckmorton, 98 U. S. 61, 25 L. ed. 93, *supra.*

Appellant urges, however, that, even though extrinsic fraud was established, the judgment should be reversed because she married decedent in good faith and without knowledge of his previous history, and that she was therefore an innocent third party within the meaning of § 548.14, *supra.* This issue is not easy of solution because of the evenly divided equities between these parties. From an early date, however, and even prior to the enactment of the statute, we refused to recognize a divorce decree irregularly and fraudulently granted in another state, even though there had been a second marriage.

In True v. True, 6 Minn. 315, 322 (458), in a well-reasoned opinion, the court said:

"We are told that the parties may marry again, and that the consequences would be disastrous to the inheritance of estates and

the legitimacy of offspring. Yet it is the constant practice of the courts to refuse to recognize as binding the decrees of courts of other states dissolving marriage contracts, when they are irregularly granted, letting the consequences of subsequent marriages take care of themselves. * * * Would it not be infinitely more to be regretted that the rights of innocent parties should be destroyed, and they, perhaps, branded with the infamy of being adjudged adulterers, and stripped of their estates by the conclusiveness of a decree obtained by fraud, than that the shame or misfortune should fall upon parties and their children, who, with indecent haste, or censurable indiscretion, have formed matrimonial alliances without first satisfying themselves on such vital considerations? It is not to be denied that the most circumspect may be led into such difficulties. Yet, when a misfortune is incurred, and must be borne by some one, it is but justice that it should not fall upon those who are free from all blame, and whose legal rights are fixed and certain."

Section 548.14 has been in existence for a number of years, having been enacted in 1877 in substantially its present form (L. 1877, c. 131, § 1). A number of cases have been before the court under this section involving actions to set aside divorce decrees, but we have found no case, nor has any been called to our attention, involving the setting aside of a judgment of annulment under this section of the statute. The principles involved in setting aside divorce decrees under the statute in question are the same as those in actions to set aside annulment judgments, however, and we therefore look to the cases involving divorce decrees as precedents to guide us in our determination in the instant case.

It has been held that an action brought under this section of the statute is equitable in its nature and governed by equitable principles. McElrath v. McElrath, 120 Minn. 380, 139 N. W. 708, 44 L.R.A.(N.S.) 505, and Brockman v. Brockman, 133 Minn. 148, 157 N. W. 1086, *supra*.

"Aside from a well-justified reluctance to annul decrees in cases where second marriages have been contracted, the tribunals of this country have, with few exceptions, treated final decrees in divorce precisely as final judgments in ordinary civil actions," Bomsta v. Johnson, 38 Minn. 230, 232, 36 N. W. 341, 343, and it is now well established in this state, despite the provision of the statute upon which appellant relies as to third-party rights, that a divorce decree may be set aside on a showing of extrinsic fraud, even though there has been a remarriage and children and property rights are involved and though death has intervened. McElrath v. McElrath and Bomsta v. Johnson, *supra.* See also 17 Minn. L. Rev. 440. This rule is also sustained by the weight of authority elsewhere in analogous situations, though the actions were not brought under a statute such as we have here. 19 C. J., Divorce, p. 169, § 421; 27 C. J. S., Divorce, p. 814, § 171; Annotation, 30 A. L. R. 1466; 34 Mich. L. Rev. 749, *et seq.*

The state has been considered an interested party in cases brought under § 548.14, *supra,* where the marital relation was involved, but it was held in McElrath v. McElrath, *supra,* that where death intervened and there were no children but only property rights involved the state had no concern, and equitable principles should govern.

Estoppel may arise precluding the granting of relief. Sammons v. Pike, 108 Minn. 291, 120 N. W. 540, 122 N. W. 168, 23 L.R.A. (N.S.) 1254, 133 A. S. R. 425. The court has the power and it is its duty to award such relief as the facts in each particular case and the ends of justice may require. Geisberg v. O'Laughlin, 88 Minn. 431, 93 N. W. 310. In view of the fact that the granting of relief is governed by equitable principles, it may be barred by laches of the party seeking relief. Brockman v. Brockman, 133 Minn. 148, 157 N. W. 1086, *supra.*

In this case the equities of the parties are very evenly divided. As far as the record shows, appellant had no knowledge of decedent's previous marital ventures nor of the annulment decree, so recently obtained just prior to her marriage to him. She ap-

parently entered into the marriage in good faith. Having no knowledge of the previous marriage and annulment decree, however, it follows, *a fortiori*, that she did not rely thereon. The element of reliance necessary in estoppel, therefore, is here lacking. Moreover, there is to be considered appellant's haste in marrying decedent after such a short acquaintance. In considering the equities of the parties, haste in remarriage is a factor. Olmstead v. Olmstead, 41 Minn. 297, 43 N. W. 67. Respondent, on the other hand, was in association with decedent for four years prior to her marriage to him. There can be no merit to any claim of laches on her part. She acted promptly after discovering the second marriage and the fraud that had been perpetrated on her. The lower court, in considering the equities, found in her favor. Unfortunately, here there is no middle ground. Only one of the parties, of course, can be the legal surviving widow of decedent. Although it is a close question, in the balancing of the equities we conclude that the trial court's determination is justified by the evidence.

Affirmed.

