### A. E. FEWELL v. J. E. TAPPAN AND OTHERS.[1]

May 2, 1947.

No. 34,051.

[1]Reported in 27 N. W. (2d) 648.

*Fowler, Youngquist, Furber, Taney & Johnson,* by *G. A. Young-quist* and *F. N. Furber,* and *Kelly & Mangan,* for appellants.
*Child & Child,* for respondent.

JULIUS J. OLSON, JUSTICE.

Action to recover damages for fraud and conspiracy. Plaintiff's case is founded upon his claim that defendants, by fraudulent means, prevailed upon him to part with his ownership of 700 shares of stock in defendant corporation at a grossly inadequate price. Defendants on this appeal are J. E. Tappan, his son, J. Elliot Tappan, Jr., and the corporation. Grace Tappan, wife of Elliot, was exonerated by direction of a verdict in her favor. Norman M. Reuterdahl was not served with process. Thus, there remains for determination here only the rights of plaintiff as against the two Tappans and the corporation. Hereinafter we shall refer to them as Tappan, Elliot, and the bakery.

Fact issues were made by appropriate pleadings. These were heard and determined by a jury, which returned a verdict in plaintiff's favor for $130,000. Defendants' alternative motion for judgment or a new trial was disposed of by denial of the motion for judgment, because, in the language of the court, as to defendants' liability, the verdict is supported by "abundant evidence" and "has the court's approval"; as to the amount of recovery fixed by the verdict, the court deemed this to present "a much more perplexing question." In its memorandum, made a part of the order here for review, the court was of opinion that the evidence as to conversations and negotiations with, "as well as payments of money to, certain individuals of unsavory reputation in connection with alleged labor difficulties and union negotiations then pending" left no doubt in the court's mind "that this evidence was properly admitted, but that the evidence was of a character" likely to adversely affect the minds of the jury against defendants. The judge deemed that this result "not only is reasonable to assume but is probable." However, the court said that "the onus resulting from such association must fall on defendants because of their responsibility in creating it." And further the court thought that the "amount allowed [by the verdict] is the maximum possible under the evidence, and the court feels that, under all the circumstances disclosed by the evidence, it is excessive." By reason thereof, the verdict was reduced to $90,000, subject to plaintiff's acceptance.

He accepted the reduction. Defendants appealed from this order and have assigned numerous alleged errors as a basis for overturning the result reached below.

■ We shall recite the facts deemed material to decision, and these will necessarily be considered in the light of the evidence most favorable to the verdict, since "On appeal from an adverse decision of a trier of fact, we follow the well known rule that the testimony must be considered in the light most favorable to the prevailing party." Bloomquist v. Thomas, 215 Minn. 35, 39, 9 N. W. (2d) 337, 340; Leitner v. Pacific Gamble Robinson Co. 223 Minn. 260, 26 N. W. (2d) 228.

Tappan and plaintiff have been long-time friends and business associates. At the time of trial, plaintiff was 72 years of age, and Tappan was his senior by about two years. Both were young men when they became acquainted in 1896, shortly after Tappan's admission to the bar. Then, finding himself in need of a lawyer's help, plaintiff engaged Tappan's professional services. He testified that "it was soon after 1896 probably that I became well acquainted with Mr. Tappan." Ever since then plaintiff has had no other legal counsel. In 1910, plaintiff and his then business associates retained Tappan's services in incorporating the bakery. Tappan testified that he "created" the bakery and that he prepared and filed its corporate articles and drew its by-laws.

In 1926, plaintiff and one L. F. Bolser owned all the stock in the bakery. Tappan had no financial interest in it at that time. But later that year he had become financially interested, and to such an extent that in 1927 he moved his law office to the bakery office and retained it there until after August 10, 1942, when plaintiff's interest in the bakery was disposed of, at which time the basis for the present litigation was created. Later, plaintiff and Tappan became equal owners of the bakery's stock, each owning a half interest and each drawing a weekly salary of $200. Plaintiff testified that about ten years after Tappan became his "partner" he had a conversation with him with regard to their relationship. "I remember John [Tappan] said that he would protect my interests the same as his own, but I

can't tell you what led up to that [statement]." The basis for plaintiff's characterization of their relationship as partners definitely appears from a written agreement entered into by them on February 21, 1938, under the terms of which they recited and agreed, so far as here material, as follows:

"'* * * Whereas said parties are the owners of all outstanding stock of the Excelsior Baking Company, a.Minnesota Corporation, and, whereas it is desired that said stock should not be sold to any other person so that the controlling interest would pass into outside hands, and for the purpose of continuing the control in the survivor in case of the death of either of said parties.

"*Therefore,* it is agreed by and between said parties as follows: It is agreed that said first and second parties at all times shall receive exactly the same salary and remuneration from the Excelsior Baking Company and that both first and second parties shall, at all times, be equally represented by directors of their own choice on the Board of Directors and that each shall have an equal voice in the management of the affairs, business and control of the Excelsior Baking Company, and that the Board of Directors of the Excelsior Baking Company shall not exceed four in number.

"No more stock shall be issued or sold by the Excelsior Baking Company without the consent of both parties hereto.

\* \* \* \* \*

"In the event of the death of either party to this agreement the survivor shall have the right to purchase all of the stock of said deceased in said company for One Hundred Twenty-Five Thousand Dollars ($125,000.00) at any time within six months of the death of the other party hereto.

"It is further agreed that all the terms of this agreement shall be binding and obligatory upon the heirs, executors, administrators and assigns of the respective parties hereto, and that in the event of the death of either party, the personal representatives, executors, administrators, or assigns shall have the same rights and be under the same terms and conditions as the deceased had or would have, had he survived, \* \* \*.

\* \* \* \* \*

"In case of any conflict between any provisions in the Articles of Incorporation and the By-Laws of the Excelsior Baking Company and this contract, then the provisions of this contract shall govern, and said parties agree to carry this contract into effect."

The issued and outstanding bakery stock consisted of 1,400 shares, plaintiff and Tappan each owning 700. To function as a corporation, it was necessary that there should be at least three stockholders. To keep plaintiff's and Tappan's ownership in perfect balance, one qualifying share was issued to Melville R. Lee, plaintiff's son-in-law, and one share to Tappan's son Elliot. These four men constituted the board of directors of the bakery and its only managing officers.

The quoted agreement remained in full force and effect until August 10, 1942. From February 21, 1938, the date of the agreement, until and including a substantial part of 1939, the corporate management appears to have moved along smoothly. During the fall of that year, however, labor difficulties arose. The usual protracted negotiations in such matters were had, resulting in the bakery management finally giving in to the union demands. The resulting contract was considered by the management as being unduly onerous and burdensome. Elliot customarily made a trip to Florida during the winter season. He did so again in February 1940, and while there met one of his friends, Ralph Overholt. The subject of labor relations came up for discussion between them. Overholt informed Elliot that he was acquainted with one J. B. Bernstein, who was experienced in matters of this kind and, as such, might be of help to the bakery officers in their then difficult situation. Bernstein and Elliot considered these matters at length. Finally, Bernstein agreed to take the problem in hand, but in order to get things started he said that it would be necessary to pay him in cash the sum of $4,000. Although Elliot had been provided with bakery funds aggregating $2,000, he found it necessary to borrow $4,000 from his wife to meet Bernstein's requirements. The agreement between Elliot and Bernstein was to the effect that certain labor representatives, to be designated by Bernstein, would use their efforts to secure a mod-

ification of the employment contract acceptable to the bakery. As might be expected, here, too, money matters came up for consideration. An arrangement was finally reached whereby the price for getting the much desired relief was set at $13,000, of which $7,000 was to be paid in cash and the remaining $6,000 at the rate of $1,000 per month. Upon Elliot's return from Florida, he took this matter up with his father, Mr. Lee, and plaintiff. The labor contract was amended and the $7,000 paid in the form of a check. The check was not cashed by the bank upon which drawn because of its size and the fact that plaintiff had not signed it or endorsed it. To get it cashed, his signature was required. Plaintiff objected to signing it, but, upon being urged by Tappan, who stated and represented that it was necessary and needed for "political" purposes, he finally did so. Thereafter, the monthly payments of $1,000 were discharged in the form of cash paid each month to either one or the other or both of the labor representatives procured by Bernstein—Kid Cann and Joey Schwartz—referred to in the court's memorandum as "individuals of unsavory reputation."

Charles T. Dalsin, the bakery's business accountant, testified that he was instructed by Tappan to prepare and use certain cash slips and to credit these to various accounts under the heading of corporate expenses. The reason for this kind of bookkeeping is obvious.

During the fall of 1940 a renewal of the company's drivers contract arose. Kid Cann called upon Tappan and informed him that, while not absolutely necessary, he thought it "well" for the bakery to pay an additional $3,500 to sweeten the union's goodwill toward the bakery; in other words, that this was a "good policy" to adopt. A meeting was had to make this effective. Present thereat were the Tappans, Joey Schwartz, and Kid Cann. The deal was consummated on that basis, Tappan and Elliot acting for the bakery.

On April 15, 1942, the bakers union of inside workers (not to be confused with the truck drivers) submitted a strike notice to the various bakeries in the Twin Cities. All of the latter presented a united front against the union demands. A fact-finding commission was appointed. Meetings were held, which Elliot attended. The

bakery finally withdrew from the joint negotiations, maintaining that it could not afford to stand the wage increase demanded. After repeated failure to reach an agreement, a strike was called by the union on July 11. After the strike was called, meetings were held with both state and federal conciliators. These meetings were attended by both of the Tappans, Dalsin, and Lee. However, these discussions bore little fruit, Tappan being insistent that the union demands should be refused. Later, under his direction, Lee posted "For Sale" signs on the bakery's property.

In the meantime, Elliot had retained the services of Norman E. Reuterdahl, named a party defendant but not a party to the action, who was employed to procure the stock of plaintiff and Tappan for $40,000, but no deal was to be made unless all the stock could be had at that price. Reuterdahl was instructed not to disclose for whom he was acting.

On August 8, 1942, Tappan called plaintiff over the telephone and urged him to come at once to the bakery office, as some very important matters were pending that demanded immediate attention. Plaintiff was informed by Tappan that the bakery's financial situation was in bad shape; that creditors were likely to bring pressure to bear to collect their claims; and that insolvency proceedings were likely to take place within a day or two. To avoid this disaster, Tappan informed plaintiff that there was a chance now, provided they both agreed, to sell their stock in the bakery so as to net each of them $20,000 in cash. Plaintiff's health was very bad. He so informed Tappan. He had been hospitalized twice and had been seeking medical aid. He had been confined to his bed suffering with what were thought to be serious ailments. However, because of Tappan's insistence, plaintiff was taken from his home to the bakery office. He was persuaded to execute an option previously prepared by Tappan. Thereby, plaintiff agreed to sell all his stock in the bakery to Reuterdahl's undisclosed principal for $20,000. On August 10 the sale was consummated, in form at least. Elliot thereby became the sole owner of all the bakery stock, and, so far as the record discloses, it is still

his and in his possession. A few days later, August 15, the strike was settled.

To consummate the deal, Elliot needed funds or collateral to raise the $40,000 necessary to acquire the stock. His father helped him finance the deal by furnishing $25,000 in U. S. government bonds as collateral security, and thereby a bank loan was obtained. Two cashier's checks were issued, each for $20,000, one payable to plaintiff, the other to Tappan. On the day following the sale, Elliot borrowed $20,000 from his father to be used in reducing his bank loan, and it was so used. In settlement, he gave his father his promissory note for the $20,000 so borrowed. The bakery secured a loan of $50,000 from the Investors Syndicate, for which Elliot had applied on August 21. As security for this loan, a mortgage upon the corporate property was given, and, in addition, an assignment was made of the bakery's insurance policy on the life of plaintiff for $50,000 payable to the bakery, which then had a cash value in excess of $19,000. This policy was the bakery's property, since it was taken out for its benefit and it had met and paid all premiums thereon as and when they matured. Elliot next gave his note to the bakery for the $40,000 purchase price of the 1,400 shares of bakery stock. With the proceeds from the $50,000 loan, he paid off the remainder of his bank loan and the $20,000 note he had given to his father, and the balance was credited upon the bakery books.

Upon plaintiff, of course, rested the burden of showing that the value of his interest in the bakery greatly exceeded the price at which he was prevailed upon to dispose of it. There was much testimony introduced, pro and con, on that issue. Important on this question is the agreement made February 21, 1938, heretofore quoted. No effort has since been made to change the valuation there agreed upon. Mr. Dalsin testified that on July 28 or 29, 1942, he conferred with Elliot about the then impending transfer of plaintiff's stock:

"* * * I said, 'Elliot, this morning I asked Mr. Lee to ask Mr. Fewell what he would take for his interest in the bakery.' And then Elliot says, 'Charlie, you keep your damn mouth shut and we will get this bakery for nothing.'"

Later that day he had a talk with Tappan. His testimony is revealing:

"* * * Tappan called me in his office and said, 'Mel is trying to raise some money to buy out the bakery, Mel Lee.' And I said, 'How much is he trying to raise?' And he said, 'Well, he is trying to raise $20,000.' And I said, 'Mr. Tappan, would you sell your interest out in the bakery for $20,000?' He says, 'Charlie, do you think I am fool enough to sell a quarter-million-dollar investment for $20,000?' "

The record also discloses that on June 20, 1942, the bakery books disclosed that its assets, in excess of liabilities, were $331,692.75. If Tassie's Bakery debt was deducted (Tassie's was a wholly owned subsidiary of the bakery), the amount of which was $14,895.25, the book value of the bakery stock was $316,797.50. The bakery's funded debt of $150,000 had then been fully paid. This apparently was what led the court to reduce the verdict from $130,000 to $90,000. The court's memorandum shows that this was the basis for the reduction of the verdict, characterizing the jury's award to be "the maximum possible under the evidence." This reduction, so the court thought, was desirable, for it said:

"* * * In the interest of justice, with the thought in mind that it may bring an end to this litigation, rather than grant a new trial on all the issues the verdict has been reduced to an amount deemed to accomplish substantial justice as between the parties."

Furthermore, the court was of opinion that the jury's verdict was not the result of passion or prejudice. Instead, it said that—

"the jury in this case manifested every evidence of intelligent, attentive and conscientious consideration of the evidence and the issues involved, and it is unlikely that any Hennepin County jury pondering the same evidence would not be influenced by the same consideration."

The record and counsels' briefs are voluminous, consisting of more than 3,200 printed pages in all. In addition, there are numerous exhibits. The trial extended for a period of over five weeks. Every

aspect of the controversy between the litigants was thoroughly examined and all facts brought to light by capable counsel. While we have related the essential facts established by the verdict, we are not to be understood as saying that defendants' claims are wholly without support. It is not unusual in fraud cases to have a sharp conflict. This is decidedly such a case.

We are presented with many assignments of error, 49 all told. We shall, however, determine only those which we deem decisive of the rights of the parties.

■ Going directly to the merits, the decisive question is whether plaintiff's claim of fraud is sustained by the evidence. That there was a continuous and intimate relationship between plaintiff and Tappan of almost half a century cannot be doubted. The relationship of attorney and client began when these men first became acquainted. Both were young men then, facing the future, as most young men do, with a hope and determination to succeed in life. For more than a quarter of a century they were close and intimate business associates. As to each other, they were in a situation similar in purpose and effect to that of ordinary copartners. The contract made on February 21, 1938, fortifies and clinches that view. Not only did they so consider themselves then, but they solemnly pledged equal rights and privileges to each other in respect to the indefinite future. There was a complete balance of rights and interests between them. By that agreement, as we have shown, they agreed that the value of each one's share was $125,000. Neither could sell his interest to another without the consent of his associate.

There can be little doubt that the jury was influenced by the arrangement thus solemnly framed by Tappan, a man learned in the law, both with respect to the continuity of the association between him and plaintiff and the value of their interests. Nor should we overlook the fact that the verdict as reduced by the court is substantially below their own valuation. These parties were dealing, and have since dealt, with actualities, not abstract niceties or legal theories. It was not for the triers of fact to ignore the obvious; nor should we. Everything considered, we think that these men, by

virtue of their contract and their manner of operating under it, stood in the relationship of copartners.

We have recently had for consideration and decision situations similar to the one here presented. We refer to Prince v. Sonnesyn, 222 Minn. 528, 25 N. W. (2d) 468, and Venier v. Forbes, 223 Minn. 69, 25 N. W. (2d) 704. In the latter case we held (223 Minn. 74, 25 N. W. [2d] 708) "that the relationship between partners is essentially one of mutual trust and confidence and that the law imposes upon them the highest standard of integrity and good faith in their dealings with each other." Applying that rule to the facts here appearing, the jury was well justified in finding that fair dealing in the acquisition of plaintiff's stock was conspicuously absent. Upon the evidence adduced, the jury could find that plaintiff's stock was actually worth more than six times the price at which Elliot's agent procured it from plaintiff. That, in and of itself, goes a long way to establish violation of the rule stated in the Prince and Venier cases.

Not to be overlooked is the further fact that in the deal resulting in the pretended sale of plaintiff's stock there was actual misrepresentation by Tappan, in that the bakery was not then, nor had it in fact been, threatened with legal proceedings likely to cause receivership or other harmful consequences. That was the claimed cause for the hurried meeting on August 8, 1942, when plaintiff was prevailed upon to sign an option for the sale of his stock, actually consummated on August 10. The fact that Tappan claims to have sold his interest at the same price is not convincing.

As we have shown, all the stock, both plaintiff's and Tappan's, was to be acquired at the same time for Reuterdahl's undisclosed principal, who turned out to be none. other than Elliot, Tappan's son. Charity forbids the thought that Elliot should hoodwink his own father by having his special agent get all the stock for $40,000 and thereby get his father's interest for $20,000, when shortly before he had told Dalsin, "* * * do you think I am fool enough to sell a quarter-million-dollar investment for $20,000?"

As to whether a conspiracy existed between the Tappans is not important, since both acted to accomplish the same purpose. Elliot's

statement to Dalsin when the latter was told to keep his "damn mouth shut and we will get this bakery for nothing" turned out exactly as planned. Not a dollar of new money has gone into the corporate enterprise through any contribution by Elliot. As we have shown, the full purchase price of $40,000 was repaid within a few days after the deal presently involved had been concluded. Tappan's $25,000 worth of U. S. government bonds was returned to him, and Elliot's note of $20,000 was as promptly paid and surrendered. Not only did Elliot thereby become the sole owner of the bakery, but he used its property and its other assets to advance his own financial interests to the extent of at least $10,000. Obviously, there was unjust enrichment, the result of a planned course of conduct in which both father and son participated. As we said in the recent case of Melin v. Baker, 223 Minn. 319, 27 N. W. (2d) 647, "one or more of the alleged conspirators may be held liable for his own acts." 1 Dunnell, Dig. § 1567b; see, also, Annotations in 72 A. L. R. 1180, and 97 A. L. R. 1312.

■ On the issue of liability, we think the record abundantly sustains the verdict and that the bakery is in no better position to escape liability than Elliot, its sole owner. A corporate veil cannot serve as a shield to one who practices fraud in getting another's property.

■ What to do with the verdict presented a "perplexing question" to the trial court, i. e., whether to grant a new trial or to reduce the verdict, with option to plaintiff to accept or reject it as reduced. Our cases do not disclose that we have always hewed close to any well-defined line of demarcation. To discuss all of them is practically impossible, nor is it likely to prove helpful. We shall therefore refer to but a few to illustrate the distinction between the two alternatives. Thus, in Nelson v. Village of West Duluth, 55 Minn. 497, 500, 57 N. W. 149, an action for trespass against the village for casting earth upon plaintiff's lot in grading a public street, we said:

"* * * it is not enough that the damages may, in the opinion of the court, be too large or too small; it must appear that they were given under the influence of passion or prejudice."

Obviously, this was a case where damages could be determined with a fair degree of exactness. The conclusion reached was that (55 Minn. 500, 57 N. W. 150) "the doctrine in Hicks v. Stone, 13 Minn. 434, (Gil. 398,) does not apply."

In Mohr v. Williams, 95 Minn. 261, 262, 104 N. W. 12, 1 L.R.A. (N.S.) 439, 111 A. S. R. 462, 5 Ann. Cas. 303, the action was "for assault and battery consisting of an alleged unauthorized surgical operation performed by defendant upon plaintiff's ear." We concluded our discussion of this subject by saying (95 Minn. 266, 104 N. W. 14):

"But in any case, whether a new trial upon the ground of excessive or inadequate damages should be granted or refused, or whether the verdict should be reduced, rests in the sound judicial discretion of the trial court * * *, in reviewing which this court will be guided by the general rule applicable to other discretionary orders. * * * [but] Where the damages are susceptible of ascertainment by calculation, and the jury return either an inadequate or excessive amount, it is the duty of the court to grant unconditionally a new trial for the inadequacy of the verdict, *or, if excessive, a new trial unless plaintiff will consent to a reduction of the amount given by the jury.*" (Italics supplied.)

In Ross v. D. M. & I. R. Ry. Co. 207 Minn. 157, 290 N. W. 566, the action was for personal injuries. Plaintiff recovered a verdict for $18,500, reduced by the trial court to $15,000, subject to plaintiff's acceptance. There, as here, plaintiff accepted. On defendant's appeal, a majority of the court sustained the order. One of the principal issues there raised was whether in such an action the trial court was justified in so reducing the verdict instead of granting a new trial. We held (207 Minn. 167, 290 N. W. 572):

"Assuming that the trial court had a right to make the order which it did make if, but only if, there was passion and prejudice on the part of the jury, we do not think that appellant was prejudiced by the order as made. It received a reduction of $3,500 to which it was not entitled. This is so because the record does not sustain a finding of passion and prejudice."

In a vigorous dissenting opinion, the cases of Nelson v. Village of West Duluth and Mohr v. Williams, *supra,* and other cases were carefully reviewed. Speaking of damages in personal injury cases, the dissenters said (207 Minn. 172, 290 N. W. 574): "Such damages must rest in the discretion of the jury and are not susceptible of calculation"; hence that a new trial should be ordered instead of remitting an excess. That was the basis for the dissent. In this case, however, the value of plaintiff's stock could be and was in fact determined by evidence of the actual physical value of the bakery property, thereby clearly bringing this case within the rule of Mohr v. Williams, *supra.* Without doubt, we think the trial court had authority to grant a new trial, unless plaintiff was willing to consent to a reduction of the verdict. Our cases are cited in 5 Dunnell, Dig. § 7152.

■ We refrain from further discussion of many of the claimed errors listed by defendants. For all practical purposes, we have considered and determined the case upon its actual merits and as determined by the court below. In this case, as in Gibbon Farmers Elev. Co. v. Herschmann, 160 Minn. 326, 327, 200 N. W. 293, 294:

"* * * This court has never followed the rule, fast becoming obsolete in most jurisdictions, that an erroneous ruling respecting the admission of evidence creates per se a right in the excepting and defeated party to a new trial. The scope of the principle that harmless error is not ground for a new trial is gradually being widened. *As applied to the admission of evidence which should have been rejected, it does not give the defeated party the right to insist upon a new trial unless it is apparent that he was actually prejudiced."* (Italics supplied.)

Actual prejudice is the test. In Mankato State Bank v. Masters, 155 Minn. 16, 18, 192 N. W. 104, 105, we said:

"* * * There is a growing tendency to depart from the old doctrine that prejudice will be presumed from the admission of evidence which should not have been received. The rule now followed is set

498

forth in [5] Dunnell, * * * [Dig. & Supp.] § 7180. We apply the rule and hold that no prejudice is apparent."

Referring to the rule itself as stated by its author, we find this:

"Error in the admission of evidence is ground for a new trial *if it is obvious, from a consideration of the whole case, that substantial prejudice resulted to the adverse party."* (Italics supplied.)

The supporting cases are found in the notes, particularly under note 51. Not to be overlooked is the rule that error without prejudice is not ground for reversal. Cf. Waters v. Fiebelkorn, 216 Minn. 489, 495, 13 N. W. (2d) 461, 465. We think the order should be affirmed, and it is so ordered.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.

