150 So.2d 746

Pauline Nally **LINDLEY**

v.

Minnie M. **LINDLEY**.

8 Div. 104.

Supreme Court of Alabama.

Feb. 28, 1963.

LeRoy McEntire, Jr., Decatur, for appellee.

Peach, Caddell & Shanks, Decatur, for appellant.

HARWOOD, Justice.

Pauline Nally Lindley filed a petition in the Morgan County Court, in equity, seeking to have declared void a decree of divorce awarded her husband, William C. Lindley, by said court on 25 June 1957. The basis of said petition was that the decree was procured by fraud upon the court, and upon the petitioner. It was further set forth in the petition that the Morgan County Court never acquired jurisdiction of the marital status; that the petitioner had a meritorious

defense; that William C. Lindley had, by his conduct, effected a recriminatory defense to any divorce brought by him; and that certain property rights, i. e., her claim as widow of William C. Lindley to veteran and social security benefits, were adversely affected by said decree.

The evidence tends to show that the petitioner, appellant here, and William C. Lindley were married 24 December 1938, in South Carolina. Thereafter they lived in various places as husband and wife until September 1952. The marriage was not a happy one. The appellee's evidence indicates that the appellant drank to excess. This the appellant strenuously denied. In September 1952, William C. Lindley, while they were residing in Greenville, South Carolina, left the appellant a note in their apartment which stated among other things:

"Pauline, for several years now we have been at each others throats either for this or that, and many times you have told me to get out & stay out. I have thought this over very carefully and have come to a decision. I got all of my wearing apperal, and is all I want. You can give the rest away or do, what ever you want with it. I would like to have my Books—if you will keep them until I can pick them up.

"I have chosen to make my Headquarters in Greensboro, N. C. the O'Henry Hotel. I will be in and out of there as I am here, and have advised Mr. Hamilton of my change of address."

In 1953, Lindley met the appellee while she was living and working in Danville, Virginia. In 1954, Lindley and the appellee were living together, and on 10 December 1954, a son was born of this union. Later the family moved to Atlanta, Georgia and according to appellee they lived in Atlanta as man and wife until his death. Though Mr. Lindley travelled in the course of his employment, his home from 1955 to his death was Atlanta, Georgia.

In 1953, the appellant initiated non-support proceedings against Lindley. Apparently these proceedings were settled out of court, and Lindley, in 1953, began making monthly payments to the appellant of $76.80, and such payments were made regularly each month until Mr. Lindley's death. Usually the payments were made by checks drawn on an Atlanta bank, though a few payments were made by postal money order. The checks or money orders would be forwarded to the appellant, in envelopes addressed in Mr. Lindley's handwriting, to the address where they had lived at the time of the separation. The appellant continued to live at this address during the lifetime of Mr. Lindley.

The appellant testified that on occasions Lindley would telephone her. In November 1956, when she had a broken ankle he called several times to inquire about her, and in February or March 1957, she received a call from him from the Poinsettia Hotel in Greenville, South Carolina, in which the following conversation ensued:

"A Well, he called me about 1:00 o'clock that night and he wanted to know how I was—said he just thought he'd call and see how I was, and I said, 'I'm just fine, how are you?' And he said, 'I'm just fine,' and he said, 'Are you about ready to get married again?' And I said, 'I'm not interested in no man, I'm already married.' and he said, 'I can't blame you, I'm interested in no woman either,' and I'd heard that he was living with Mickey and they had a baby and I said, 'Dock, how is Mickey and the baby?' And he said, 'What do you mean?' And I said, 'I happen to know about this—you're living with Mickey and have a baby,' and he said, 'If somebody told you that, it's a lie, I'm interested in no woman.' That was in '57."

The appellant also testified that in 1953, she received a letter from an attorney in Tampa, Florida, relative to her husband securing a divorce, (the appellant would not

agree to a divorce), and that except for this, she had never received any notice pertaining to any divorce proceedings.

On 8 April 1957, William C. Lindley filed in the County Court of Morgan County, Alabama, a bill seeking a divorce from the appellant on the grounds that she had abandoned him. He asserted in his bill that the residence of the appellant was unknown and could not be ascertained after reasonable effort, and that he had been a bona fide resident of this State for over one year next preceding the filing of the bill.

An affidavit of Lindley to the effect that the residence of the appellant was unknown and could not be ascertained after reasonable effort accompanied the bill. In consequence service of process in the divorce action was by publication in a newspaper published in Morgan County, Alabama.

In support of his bill for divorce Lindley testified before a commissioner that he was a bona fide resident of Alabama, and had been for three years preceding the filing of the bill, having lived in Birmingham for two years, and in Decatur for one year next preceding the filing of the bill, and was residing at the Lyons Hotel in Decatur.

On 25 June 1957, a decree pro confesso was entered granting Lindley's petition for divorce, and some 34 days later he and the appellee were married. On his marriage license Mr. Lindley's address is shown as East Orange, New Jersey.

In addition to the evidence already referred to, there was introduced at the hearing below additional evidence tending to show that Lindley was a registered guest at the Lyons Hotel in Decatur on four separate occasions, in 1957, to wit: 7–8 April, the bill of divorce being filed on 8 April; 7–8 June; 22 June, the day on which he testified before the commission; and 28–29 June, or three days after the decree of divorce was rendered.

Mr. Lindley's will, dated 20 June 1957, introduced by appellant recited he was residing in Atlanta, Georgia.

For a long number of years Mr. Lindley had been an employee of the Worthington Corporation.

Mr. W. Skeggs Crawford, Employment Manager of the Decatur Works of the Worthington Corporation, testified on cross examination that Mr. Lindley, to his knowledge, had never been a resident of Decatur, Alabama, and that "the very nature of his job would say he would be assigned and live where the regional office is located, which would be Atlanta."

Mr. Crawford further testified that a visitor's register is maintained at the Worthington Works in Decatur, and that on 8 April 1957, the register reflects the signature of W. C. Lindley, with his address shown as Atlanta.

Mr. Lindley died in Atlanta on 12 November 1958, having been a victim of leukemia for some two and a half years. The appellee nursed him during this illness. His death certificate recites that he was a resident of Georgia, and had been for six years prior to his death. The appellee stated this was correct.

In January 1959, the appellant applied to the Veterans Administration for benefits as the widow of Lindley. She was informed that the amount of her earnings at the time of her application rendered her ineligible. In July 1959, the appellant became disabled, and again applied for benefits, and also applied for certain Social Security benefits as the widow of Lindley.

The appellant was informed by the Veterans Administration that the appellee also claimed certain benefits as the widow of Lindley.

After employing a lawyer, the appellant wrote the Veterans Administration she had never instituted any divorce proceedings herself, and was unaware that any such proceedings had been instituted against her.

Thereafter the Veterans Administration by letter dated 15 September 1959, informed the appellant that their records showed that

Lindley had divorced her on 25 June 1957 in Morgan County, Alabama.

Appellant's application for Social Security benefits as the widow of Lindley was also denied on the basis of the Morgan County divorce.

The appellee's evidence was directed toward showing that the appellant learned that Lindley and appellee were living as husband and wife in May 1955, some five months after the birth of the child; that Lindley and appellee visited his relatives in South Carolina and that appellee was introduced as his wife.

It appears that in 1957 or 1958 Lindley and appellee were present at a family reunion in South Carolina, as was the appellant. The appellee was introduced as Lindley's wife, and the child as his son. The appellant made no issue as to Lindley's marriage and at one time held the child in her lap.

The appellant attended Mr. Lindley's funeral, and the appellee and her child were present. The appellee sat with the Lindley family, and the appellant did not.

It was also shown that the last checks forwarded to appellant by Lindley for the monthly support payment, and dated 10–4–1958, bore a printed legend in the upper right hand corner "Mr. or Mrs. William C. Lindley, 671 University Ave., S.W., Apt. 10, Atlanta, Georgia." The check bore the signature of Mr. Lindley. The appellant had never had an account in the Atlanta bank on which the check was drawn.

Appellee's evidence also shows that she nursed Mr. Lindley for a long period of time preceding his death, probated his will, and collected on his insurance policy, and paid some of his debts from the proceeds of the policy. In this connection other evidence shows that the appellee was the sole beneficiary under the will, and the beneficiary of the insurance policy. The appellee did not work during the time she lived with Mr. Lindley and testified she had no income or inheritance during her stay with

Mr. Lindley, so it must be assumed that the expenses preceding his death were paid from monies earned by Mr. Lindley.

Following the hearing the court entered a decree denying the petition. The portions of the decree pertinent to this review read as follows:

"The Court is of the opinion that Petitioner has not been diligent. She has allowed the Respondent to be lulled into a sense of false security. Through a course of conduct covering some four years, she has indicated no dissatisfaction with the arrangement between her former husband and Respondent and seemed to be satisfied with her monthly stipend, even to the extent of having met 'The woman and her child' in May of 1958, some nineteen months prior to the filing of her bill herein. During that nineteen months period, W. C. Lindley has died, and any light that he might have shed upon the issues presently before the court has died with him. The Respondent, Minnie Lindley, has buried the deceased, probated his will, collected his insurance and incurred considerable expense and paid the same on the basis that she was his wife. There has been many occasions in the course of this affair whereby Petitioner could have raised the issues presented by her present bill, if not prior to the death of W. C. Lindley, at least prior to Respondent's having incurred and paid the expenses which the evidence showed she did. This Court is not the only tribunal, wherein the want of jurisdiction could be raised, if, as Petitioner alleges, it was completely lacking. No Court is obliged to give full faith and credit to the decree of a Court completely without jurisdiction of the subject matter or the parties.

"Petitioner has offered considerable evidence to the end that the decree of this Court of June 25, 1957, was the result of a gross fraud on this Court perpetrated by the deceased, W. C. Lind-

ley, and has urged the Court to the position that a decree which is the fruit of such a fraud can be and should be discarded and held to be a nullity by the Court, no matter how the Court is made aware of it, even to the extent of moving ex mero motu.

"Such may be the case, but where one party shuts her eyes and ears to the facts and delays to the end that another commits herself to a course of conduct that moves to her detriment and then comes forward after the commitment and prays for relief that well might have been granted without a resulting hurt, had such prayer been timely presented, then the Court will also shut its eyes and ears to Petitioner's prayer for relief and refuse to consider that which might have been otherwise given almost without the asking.

"By reason of the staleness of Petitioner's demand and the intervening injury resulting to Respondent if granted, the Court is of the opinion that Petitioner is not entitled to relief, and it is, therefore * * *."

It is apparent from the language of the decree that the lower court bases its conclusion that the petition should be denied solely on the ground of laches on the part of the petitioner.

█ Rights of a widow to veteran's and social security benefits under applicable laws are rights of property entitling the widow to have set aside a purported decree of divorce which was obtained by fraud on the part of the deceased husband. Nor does the death of the spouse who has fraudulently obtained the divorce deprive a court of power to set aside such divorce decree. Lucas v. Lucas, 252 Ala. 626, 42 So.2d 457; Vaughan v. Vaughan, 258 Ala. 336, 62 So. 2d 466. See also Hartigan v. Hartigan, 272 Ala. 67, 128 So.2d 725.

We come now to consider whether this appellant should be charged with laches, which is the basis of denial of relief by the lower court.

█ There is no arbitrary rule for determining when a demand becomes stale, or what delay will or will not be excused. The question of laches is to be decided upon the facts of each particular case. Wells v. Wells, 249 Ala. 649, 32 So.2d 697. In the Wells case, supra, this court held that a delay of 21 months in filing a bill to cancel a deed "requires no discussion to demonstrate that this short delay in filing the bill with nothing more appearing does not suffice as an objection to the bill upon the ground of laches."

While the Veterans Administration had written the appellant on 20 August 1959 that their records showed that Lindley was married to appellee at the time of his death, the first firm information that the appellant had of the place where Lindley had obtained his divorce, was the letter she received from the Veterans Administration dated 15 September 1959.

█ The appellant was then residing in South Carolina. It was necessary for her to obtain legal representation in Alabama. Her attorneys in Alabama had to make an investigation, obtain evidence to support her action, and prepare the necessary pleadings. The bill was filed on 25 January 1960, some four months and ten days later. We hold that as a matter of law that this length of time does not, without more, constitute laches on the part of the appellant.

█ Nor do we agree with the view of the lower court that the appellant's knowledge of the meretricious relationship between Lindley and the appellee, and that Lindley had introduced the appellee as his wife at a family reunion which was attended by the appellant, and that the appellee had probated Lindley's will and collected his insurance, and paid some of Lindley's debts, could in anywise tend to put the appellant on notice that Lindley had, without notice to the appellant, divorced her.

The policy of the law is to discourage the breaking up of the marriage relationship. The fact that the appellant suffered the indignity of conjugal infidelity without posi-

tive action cannot be deemed to amount even to acquiescence in the liaison between Lindley and the appellee. Certainly such negative conduct in the circumstances cannot be said to be non diligent.

Lindley and the appellee began living together in 1954. A child was born to them in 1954. It was not until 1957 that Lindley secured a decree of divorce, said decree being granted on published notice only as a result of Lindley's affidavit and testimony that the whereabouts of the appellant was unknown and could not be determined after reasonable effort. The undisputed evidence shows that since 1953 Lindley had mailed to the appellant each and every month checks or money orders in the amount of $76.87. These payments were made as a result of an out of court settlement of a prosecution brought against Lindley by the appellant for nonsupport. They arose by virtue of Lindley being the husband of the appellant and not as alimony. That he continued to make these payments until his death would justify the appellant in assuming that this status continued. The legend on the last check reading "Mr. or Mrs. William C. Lindley" etc., is of no significance in indicating that Lindley had obtained a divorce in view of the open man and wife role which he and the appellee had assumed for three years prior to the obtaining of the divorce decree.

In the present decree the lower court noted: "The petitioner, as early as 1955, learned of the existence of the child and heard from a source in Charlotte, North Carolina that her husband had divorced her. This was not true at the time."

We think the lower court has inadvertently misinterpreted the evidence in this instance, for the only reference to anything the appellant may have learned in Charlotte, North Carolina as disclosed in the record is the following from the cross examination of the appellant:

"Q After you learned that William C. Lindley and the respondent were living together as husband and wife, did you make any inquiries as to whether divorce proceedings were instituted?

"A I had asked several members of the family when and where he got a divorce. None of them knew, I also visited the Michealsons' in Charlotte, in 1956 and Mrs. Michealson told me—I asked her where Dock got his divorce and she said, 'I don't know if he got one and I don't know if he is married, but they certainly are living together,' so I couldn't find anybody that knew when and where he obtained a divorce.

"Q You talked to him a number of times during this time over the telephone, you stated?

"A Yes, sir."

The appellee being the sole beneficiary under the will, and the insurance policy, her probating the will and collecting on the insurance policy clearly could not raise a defense of laches against this appellant. Nor could the payment of certain debts of Lindley out of the proceeds of the policy or other monies since the appellant was in no wise responsible for appellee's actions in the premises, even if she had notice thereof.

■ The appellee testified that Mr. Lindley informed her he was married when she learned she was pregnant. With this knowledge, and at his invitation, she then began living with him, as she said, for the sake of her coming child. After three years Lindley informed her that he had secured a divorce in Alabama, and thirty-four days after this decree they went through a ceremonial marriage. While the appellee was placed in an unfortunate dilemma by her conduct, she cannot be deemed an innocent party. Not being innocent, she is in no position to assert laches against the appellant.

■ While courts are reluctant to set aside divorce decrees where there has been a second marriage, this reluctance is abandoned when the parties to the second marriage have knowingly lived in adultery prior

to the obtaining of a decree of divorce. See 17 Am.Jur., Divorce and Separation, Sec. 517.

The principles covering the facts pictured by this record abundantly supported by authorities, are set forth in an annotation to be found in 12 A.L.R.2d 155, as follows:

"The consideration given to a second marriage is generally based on the assumption that innocent parties will be involved in an intolerable situation if the decree is vacated. But if the second spouse of a divorced person is not innocent, she or he is not entitled to much consideration in equity. Thus, where the second wife of the divorced man lived with him in adultery before the divorce, or if she knew or had notice of the facts justifying the vacation of the decree, she is not entitled to the consideration when determining whether to vacate the divorce decree. Somewhat similarly, it is often held that if the second marriage was 'hasty,' that is, if it occurred shortly after the decree was entered, it is not equitably entitled to much weight; and it may be noted that in such cases there is frequently room for suspicion that the second spouse is not an innocent party, or had knowledge of the facts rendering the decree voidable."

It is unfortunate that the status of a child may be affected if the divorce decree be set aside. His rights are derivative of, and must be determined by the rights and conduct of his mother. Our sympathy for the child cannot blind us to legal redress and rights that may be rightfully due this appellant. The interests of innocent parties should not be destroyed by the misconduct of a third party. See Wisdom v. Wisdom, 24 Neb. 551, 39 N.W. 594; Evans v. Evans, 60 Or. 195, 118 P. 177; Bloomquist v. Thomas, 215 Minn. 35, 9 N.W.2d 337.

Being clear to the conclusion that the lower court erred in denying the petitioner relief on the grounds that laches barred the granting of relief, this judgment is re-versed, and the cause remanded to the lower court for further consideration.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.