DE SIMONE, and wife, Respondents, v. KRAMER, and another, Appellants: NEWMAN, Defendant.

*No. 75–28. Submitted on briefs March 3, 1977.—*
*Decided April 19, 1977.*
(Also reported in 252 N. W. 2d 653.)

For the appellants the cause was submitted on the brief of *Toft and Toft* of Sturgeon Bay.

For the respondents the cause was submitted on the brief of *Kaftan, Kaftan, Kaftan, Kuehne & Van Egeren, S. C.* of Green Bay.

DAY, J. The defendants-appellants (sellers) appeal from a judgment for the plaintiffs-respondents (buyers) in an action to reform a deed. Trial was to the court. The parties own adjoining lots on Sturgeon Bay and the dispute concerns the obligation of the sellers to convey one hundred thirty-three feet of shore line to the buyers. The shore line as determined by the court was approximately one hundred and fifteen feet and the court awarded damages for the additional eighteen feet of shore line rather than reform the deed to include the

additional eighteen feet. Sellers appeal from the finding in favor of the buyers and the damage award. Buyers in turn, in a motion for review, claim that the court should award the additional lake front footage rather than damages.

The questions on appeal are:

(1) Was the trial court's finding that the sellers agreed to convey one hundred and thirty-three feet of actual shore line as measured at the water's edge against the great weight and clear preponderance of the evidence?

(2) Did the trial court err in assuming without expressly deciding that under the riparian doctrine of accretion the sellers owned and thus could convey the land added to the lots by dredging?

(3) Did the trial court err in the manner in which it apportioned the accreted land between the adjacent land owners?

(4) Did the court err in granting money damages instead of extending the shore line of the buyers' property by an additional eighteen feet?

In August of 1969, the buyers purchased from sellers lots eleven and twelve and a portion of lot ten of the M. J. Jasper's Addition to Sturgeon Bay platted August 20, 1928. Sellers retained the remaining portion of lot ten. Sellers were represented by Percy Newman, a Sturgeon Bay realtor who was a defendant below but did not appeal. The plat map referred to by the parties prior to sale shows lots abutting on Sturgeon Bay and extending to the street shown at that time as Jasper Drive. The name of the street was apparently later changed to Tacoma Beach Road. However, subsequent to the platting the Army Corps of Engineers dredged the bay for a ship channel, depositing the fill along the shores of the lots in question. As a result, the plat boundaries on the map no longer accurately reflect the shore line.

The buyers alleged the deed did not accurately describe the property the parties intended to convey.[1] The purchase and sale agreement executed by the parties provided that the land had a "road frontage about two hundred feet having a frontage of about one hundred and thirty-three feet with a depth of about two hundred and fifty feet to three hundred feet." The principal factual issue is whether the land purchased by the buyers contained one hundred and thirty-three feet of frontage as agreed upon in the purchase contract.

Sally R. De Simone testified that she and her husband and children were shown the lots by Mr. Kramer and real estate broker Newman. At the time, the De Simones were given a copy of the 1928 plat of Jasper's Addition. She testified that in inspecting the property, they walked along the actual shore line to determine the boundaries of the property. This testimony was corroborated by Mr. De Simone and by Eileen Etherton, an area resident and friend of the De Simones who viewed the property with them.

The seller, Mr. Kramer, by contrast, testified that he did not walk along the shore line with the De Simones. He admitted he contracted to convey one hundred and thirty-three feet of frontage and testified that what he meant by "frontage" was the original pre-fill property boundary as evidenced by the survey pins. He stated that he had personally measured this line and found it to be 134.8 feet. (On the diagram included with this

[1] Description in deed: "A tract of land in the M. J. Jasper Plat, City of Sturgeon Bay, Door county, Wisconsin, more particularly described as follows: All of lots 11 and 12, and that part of lot 10 described as follows: beginning at the southwest corner of lot 10, then southeasterly along Tacoma Beach Road to the southeast corner of lot 10 thence northly along the east line of lot 10 to the northeast corner of lot 10, then southwesterly to the point of beginning. Together with all riparian rights thereto."

opinion, which is not drawn to scale but is for illustrative purposes only, the line referred to by Mr. Kramer's testimony would be from point B to point I).

Diagram (Not drawn to scale)

Approximately a year after purchasing the property, the De Simones built a house and the property was then appraised at $55,000. When the De Simones discovered there was some problem with regard to the extent of their shore line, they went to the broker, Mr. Newman, who engaged Thomas R. Arnott to survey the land. The map drawn by him was an exhibit at the trial. The accuracy of this map was admitted by the sellers' witness Jerry D. Slavik, a surveyor, except that he testified he could not locate the pin shown at point H in the diagram and said the high water mark was from point B to point I and in excess of one hundred and thirty-three feet. It showed the lots as platted in Jasper's Addition (area covered by points A, B, H, J on accompanying diagram). The Arnott map also incorporated the fill area by using a formula previously approved by this court in *Jansky v. Two Rivers*, 227 Wis. 228, 240, 278 N.W. 527 (1938) in which this court said:

". . . in apportioning an accretion or reliction, the new division lines must be drawn in a straight line, at a right angle to the present shore line, from the points at which the division lines of coterminous owners intersected the original shore line." 227 Wis. at 240. (This would be the area enclosed by points B, D, F, and H).

The Arnott map identified the line B to H as "original high water line as best as can be determined." This map showed the frontage line of D to F as being 109.33 feet.

The trial court found the defendants agreed to convey one hundred thirty-three feet of frontage along the water's edge. In its judgment the court reformed the deed by extending the west boundary of lot eleven and the east boundary of lot twelve to the natural shore line. (Lines K–B and J–H extended northerly to points C and E).

The intent of the parties to convey actual shore property and not merely lots as bounded by the pre-fill 1928 plat map was established by the testimony of the De

Simones and the real estate listing contract which referred to "one hundred thirty-three feet shore frontage." The court observed in its decision that,

"It is inconceivable to me that people who are interested in buying shore property for recreational or summer home purposes would not be concerned about the extent and location of the water frontage involved, and to suggest that there never was any discussion or pointing out of the extent of the frontage along the water's edge is incredible."

The trial court was entitled to consider the conduct of the parties and the negotiations which took place, both before and after the execution of the documents and to consider all related documents of the parties in determining their intent. *Smith v. Osborn,* 66 Wis.2d 264, 272, 223 N.W.2d 913 (1974).

The trial court's findings of fact that the parties referred to the actual shore line in their negotiations is not against the great weight and clear preponderance of the evidence and therefore must be accepted by this court. This action for reformation is an action in equity and this court has held that in equity cases, the test on review is whether the findings made are contrary to the great weight and clear preponderance of the evidence. *First Nat. Bank v. Scalzo,* 70 Wis.2d 691, 700, 235 N.W.2d 472 (1975); *Baldwin v. Anderson,* 40 Wis.2d 33, 41, 161 N.W.2d 553 (1968).

Another contention raised by the sellers is that the trial court erred in assuming that the sellers owned the land added to the original lot by dredging and were therefore in a position to convey it. This issue was brought into focus by Mr. Kramer's testimony, not believed by the trial court, that in showing the De Simones the lots, he did not walk the shore line but rather pointed to the survey pins which he claimed represented the original high water line. However, the court assumed the

seller owned and thus could convey the accretion to the original lots. The court stated:

". . . Therefore it appears in this situation that the frontage to be included in the sale of this property was measured along the waters of the bay and that a substantial portion of the lots to be conveyed consisted of property that had been filled by the Corps of Engineers so as to substantially extend the property between the assumed original high water line or shore line and the bay."

There was some evidence that the filled property was a result of the Corps of Engineers dredging the ship channel but no actual history of the project was produced at trial. On this appeal, the sellers raised the argument that the fill area was not theirs to grant.

If the fill area separating the platted boundary of the property from the bay were naturally caused, it is clear that the new land would belong to the riparian owner. In 1877, this court said riparian rights include "the right of the riparian owner to accretions formed by slow and imperceptible degrees upon or against his land. . ." *Boorman v. Sunnuchs*, 42 Wis. 233, 242.

In *Doemel v. Jantz*, 180 Wis. 225, 235, 193 N.W. 393, 31 A.L.R. 969 (1923), this court said the riparian owner "obtains the right and title to the soil formed by accretions and relictions." At page 236, the court stated the riparian owner's rights to the shore are exclusive as to all the world, excepting only where those rights conflict with the rights of the public for navigation purposes.

Accretion has been defined as "the increase in land caused by the gradual deposit by water of materials on the shores, which deposit replaces the water at this location with dry land." *Baldwin v. Anderson*, 40 Wis. 2d at 44, citing 3 *American Law of Property*, p. 855,

sec. 1526; 5 A. Thompson, *Real Property*, p. 599, sec. 2560. Thus if the fill area in question is the product of accretion, title to the accreted soil vested in the riparian owner, in this case the seller, who was free to convey the same to the De Simones.

Since the fill adjoining lots eleven and twelve was the product of government dredging, the made land cannot be considered accretion in the classic sense; it was not gradual, not gained "by small and imperceptible degrees." 2 Blackstone, *Commentaries*, p. 262, cited in *Boorman v. Sunnuchs, supra,* 42 Wis.2d 233, 244 (1877); *Rondesvedt v. Running,* 19 Wis.2d 614, 616 n 1, 121 N.W.2d 1 (1963).

Defendants cite *Menominee River Lumber Co. v. Seidl,* 149 Wis. 316, 135 N.W. 854 (1912) for the proposition there can be no accretion where the deposit is artificially induced. But in that case formation of the made land was induced by the dredging of the riparian owner himself. The policy against allowing title to vest is found in this fact. "To sanction such a rule would be to hold that a riparian owner could by artificial means acquire title to the bed of a lake far below the shore which belonged to the state." 149 Wis.2d at 320.

In *Priewe v. Wisconsin State Land Improvement Co.,* 93 Wis. 534, 67 N.W. 918 (1896), by comparison, plaintiff's shore line was enlarged by the artifically caused drainage of the lake by a third party. The court held this was "not the case of reliction or accretion by slow and imperceptible degrees from natural agencies. . . . But it was, apparently, the drainage of low, marshy land, and the lowering of the lake by artificial agencies, for the benefit of riparian owners. . ." The court held that the plaintiff, as a riparian proprietor, had free access to the lake, especially because no objection was made by the state. 93 Wis. at 548.

Insuring a riparian's owner's access to the water is the most frequently cited rationale for the rule alluvion formed by accretion belongs to the owner of the upland to which it is contiguous. *Rondesvedt v. Running, supra,* 19 Wis.2d at 620.

The rule reflects "the desirability of keeping land riparian which was riparian under earlier facts, thus assuring the upland owners access to the water and the advantages of this contiguity." 7 *Powell on Real Property,* §983 p. 610 (1975) citing *Lamprey v. Metcalf,* 52 Minn. 181, 53 N.W. 1139 (1893).[2]

The desirability of protecting a property owner's riparian right of access is not lessened when a government entity causes the made land through artificial means in pursuit of a navigation project, at least when the government does not lay claim to the made land for purposes of navigation, fisheries or other exercises of the police power. It appears to be the prevailing doctrine that the causing or hastening of gradual deposits by artificial constructions, made by persons other than the benefited and claiming owner, does not prevent the doctrine of accretion from applying. 7 *Powell on Real Property, supra,* §983 p. 614.

In *Bonnelli Cattle Co. v. Arizona,* 414 U.S. 313, 38 L. Ed.2d 526, 94 S. Ct. 517 (1973) the federal common law of accretion was discussed. Upon admission to the Union, the State of Arizona took title to the bed of the Colorado River. Petitioner Cattle Company owned land adjacent to the river. While this land was owned by a predecessor in title, the river shifted, covering the land. In this situation, the land belonged to the state,

---

[2] Other, less frequently mentioned rationales have been suggested. Note: "Artificial Addition to Riparian Land: Extending the Doctrine of Accretion." 14 Ariz. L. Rev. 315 (1972).

as owner of the river bed. However, the land re-emerged as a result of a federal rechanneling project. The land owner brought action to quiet title. In holding for the land owner, the court said,

"The policies behind the doctrine of accretion are, however, fully applicable. That doctrine guarantees the riparian character of land by automatically granting to a riparian owner title to lands which form between his holdings and the river and thus threaten to destroy that valuable feature of his property. The riparian owner is at the mercy, not only of the natural forces which create such intervening lands, but also, because of the navigational servitude, of governmental forces which may similarly affect the riparian quality of his estate. Accordingly, where land cast up in the Federal Government's exercise of the servitude is not related to furthering the navigational or related public interests, the accretion doctrine should provide a disposition of the land as between the riparian owner and the State. See Michaelson v. Silver Beach Assn. 342 Mass 251, 173 NE2d 273 (1961).

"Similarly, riparian lands may suffer noncompensable losses or be deprived of their riparian character altogether by the State or Federal Government in the exercise of the navigational servitude. In compensation for such losses, land surfaced in the course of such governmental activity should inure to the riparian owner where not necessary to the navigational project or its purpose." 414 U.S. at 329.

In *Michaelson v. Silver Beach Improvement Asso. Inc.*, 342 Mass 251, 173 N.E.2d 273, 91 A.L.R.2d 846 (1961) cited in *Bonnelli*, plaintiff sought to enjoin public use of a beach created by the Commonwealth's dredging for a harbor improvement project. The court acknowledged the Commonwealth could make surface land below the low water line with title to the Commonwealth and no remedy in damages to the adjacent littoral owner. For such to be the case, however, the court held there must be a substantial relation between the project (the

made land) and the public powers over navigation and fisheries. The court added:

"Even if it is assumed that interference with the right of access may in certain circumstances constitute a taking for which the Commonwealth may be liable in damages, the plaintiffs contend that the land created by the Commonwealth belongs to them as the littoral owners, as would a gradual growth of the beach by natural accretion or by accretion aided by an artificial force. This contention impresses us as sound. A littoral owner takes his property with the knowledge that the boundary may change by accretion or reliction. This is a necessary condition of owning property along tidal waters. It is further assumed that coastwise and tidal currents may be altered by public works necessary for the fisheries or navigation. Such projects may drastically change the direction and force of the natural currents. But they are in accord with the traditional and essential governmental powers to which the riparian land is held subject. Consequently the law applicable to natural accretions should govern." 173 N.E.2d 277–278. (Footnote omitted.)

For a similar result see *Harrison County v. Guice,* 244 Miss. 95, 140 So.2d 838 (1962). Compare *United States v. Harrison County, Mississippi,* 399 F.2d 485, (5th Cir. 1968) cert. den. 397 U.S. 918 where a public purpose was found in the made land. *See generally,* Annot., 91 A.L.R.2d 857 (1963); *Cf.* Annot., 63 A.L.R.3d 249 (1975).

We conclude the land in question belonged to the sellers, subject to any paramount rights of the United States or the state of Wisconsin, not here litigated, and it was theirs to convey.

The sellers also argue that the lower court improperly apportioned the fill area, citing *Jansky v. Two Rivers, supra.*

This is the formula used by Arnott in his survey. The trial court, however, described the land accreted to

lots eleven and twelve as bounded by the west line of lot eleven and the east line of lot twelve as those lines are extended to water's edge. The trial court expressly declined to apply the *Jansky* formula for reasons related to the expectations of neighbors, past use, uncertainty regarding the original high water line, and the "ridiculously-shaped" lots which would result. This court has already held with respect to the *Jansky* rule that it "is not to be strictly applied so as to produce an inequitable result because of particular circumstances." *Rondesvedt v. Running, supra,* 19 Wis.2d at 618.

Another reason *Jansky* need not be followed is that accretions may be divided among adjacent land owners by agreement as well as by actual survey. *Jennings v. Shap,* 115 N.W.2d 12, 17 (N.D. 1962). Such an agreement was found in this case. The court found the sellers measured the one hundred and thirty-three feet from the east line of lot twelve when the land was shown to the buyers.

The lower court calculated the shore line conveyed to the De Simones consisted of one hundred and fifteen feet at water's edge, not the one hundred thirty-three feet contracted for. The Kramers do not challenge this finding.[3] This opinion affects only the land here under litigation and does not determine or set a rule as to how accreted land along other lots in the Jasper's Addition on Sturgeon Bay is to be apportioned between adjoining landowners.

The buyers, De Simones, ask this court to reverse that part of the judgment which awarded them money damages and order specific performance. The trial court, however, stated:

---

[3] They do, however, compute a different figure based on the *Jansky* formula. This is immaterial because *Jansky* was not used and because it is an attempt to add to the record on appeal. The computation, even if correct under *Jansky* assumes survey pin placements not found to be fact below.

"It therefore appears that the plaintiffs acquired 115 feet of frontage at the water's edge, whereas their contract called for 133 feet of frontage. While I am satisfied that the Kramers are the owners of sufficient property so as to permit this Court to require a conveyance of an additional 18 feet to the plaintiffs, such a conveyance either by deed or by court judgment would substantially interfere with the future property lines of owners of the remaining portion of Lot 10 and would result in a ridiculously shaped lot both with respect to the owners of Lot 10 and Lot 11."

Damages will be awarded where specific relief is unsuitable or inequitable due to a change in circumstances or for some other reason. *Williston On Contracts,* Third Edition, sec. 1444. This was a matter for the discretion of the trial court. *Kimball v. Swenson,* 47 Wis.2d 472, 481, 177 N.W.2d 375 (1970). That discretion was not abused here.

*By the Court.*—Judgment affirmed.