**READS LANDING CAMPERS ASSOCIATION, INC.,**
Respondent,

**Soo Line Railroad Company, d/b/a CP Rail System, petitioner,**
Appellant,

v.

**TOWNSHIP OF PEPIN, Respondent,**

**State of Minnesota, Respondent,**

and

**Richard McCaleb, et al., intervenors-defendants, petitioners,**
Respondents.

No. C2–94–2133.

Supreme Court of Minnesota.

April 19, 1996.

---

Review of Court of Appeals.

Patrick J. Nugent, Minneapolis, for appellant.

Jerry Kellum, Winona, for Reads Landing Campers Assoc.; William L. Thomas, Lake City, for Township of Pepin; Hubert H. Humphery, III, Attorney General and Donald A. Kannas, Assistant Attorney General, St. Paul, for the State of MN; George L. May, Hastings, for Richard McCaleb, et al.

Heard, considered and decided by the court en banc.

# OPINION

GARDEBRING, Justice.

Reads Landing Campers Association (RLCA), in a declaratory judgment action against the Township of Pepin (Pepin), sought a judicial determination that two platted but undeveloped streets that gave access to the Mississippi River had been abandoned by Pepin. The parties added Soo Line Railroad (Soo Line) and the State of Minnesota (state) when ownership of the riparian beach front property, through which the platted streets passed, also became an issue. Soo Line and its lessee RLCA, sought a determination that Soo Line was owner of the riparian lands created by the deposit of dredge spoils along the bank of the Mississippi River in Pepin. Richard McCaleb and other citizens of Reads Landing (intervenors) intervened.

On cross motions for summary judgment the trial court determined that Soo Line owned the property in question, but rejected the argument that the streets had been abandoned. The court of appeals agreed. We affirm, concluding that the deposit of dredge spoils is neither accretion nor avulsion, but that land created through such actions belongs to the upland riparian owner. On the issue of abandonment, we determine that there were not the requisite affirmative and unequivocal acts necessary to prove abandonment of the platted streets.

The facts in this case are largely undisputed. Reed's Addition to Pepin [1] was dedicated and platted in 1870. It consisted of four blocks adjacent to the Mississippi River and included two dedicated streets running perpendicular to the river, Reed Street and Main Street. As platted, these streets crossed Water Street and the railroad tracks and ran to the river's edge.

Soo Line and its predecessors have owned the land north of Water Street since before the turn of this century. Beginning in 1927 and running throughout the 1930's and 1940's, the U.S. Army Corps of Engineers conducted dredging operations along the Mississippi River bank at Pepin. The purpose of the project was to deepen the channel to allow for better navigation through that section of the river. In the process, over one million cubic yards of dredge spoils were deposited in front of the Soo Line property creating the beach area now in dispute. Since the time the property was created, it has been used for recreational purposes. Members of the public have used the undeveloped streets to access the river and have used the property as public beach.

In 1966, Soo Line began to lease the property in question. Various commercial enterprises were established on the property over the course of several years by different lessees. The property has been used as a campground and boat harbor. It is uncertain when, but at some point a building was erected, protruding onto a portion of Main Street; it was used over the years as a bait shop, refreshment stand and clubhouse. In 1991, through the assignment of a prior lease, RLCA took control of the property. RLCA closed down public access to the river by installing cable across Main Street and Reed Street leading to the beach. In addition, RLCA set up a line of campers on the beach and added other structures to the area.

RLCA and other lessees of the property have acquired licenses from county and state agencies to conduct business activities and to maintain a campground on the property. Their predecessors also obtained permits from the county and state entities, as well as a federal agency, to create, operate and maintain the marina and harbor. Liquor and food service licenses had been issued to the former lessees by the Goodhue–Wabasha County Community Health Services. Documents in evidence show that a township chairman approved at least four of the liquor licenses as required by law. In addition, the Minnesota Department of Health had issued annual licenses and performed health inspections on the campground facility, and the Minnesota Department of Natural Resources had issued permits to previous lessees to

---

1. It should be noted that in the 1870 plat, "Reeds Addition to Pepin" and "Reed Street" are spelled with "double e's". However, the contemporary spelling of Reads Landing and the Reads Landing Campers Association makes use of "ea" rather than "ee."

operate and maintain the marina and harbor. Finally, the Department of the Army issued a permit to allow for the creation of the harbor and marina.

■ On appeal from summary judgment, this court will determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Offerdahl v. University of Minnesota Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). Because the parties agree the material facts are not in dispute, the only questions before this court are questions of law. Thus, this court need not defer to the lower courts when making its determination. *A.J. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.,* 260 N.W.2d 579, 582 (Minn.1977).

■ We first consider the issue of ownership of the riparian land created by the deposit of dredge spoils upon and along the bank of the Mississippi River.

> The general rule concerning the rights of the owner of riparian land in this state is well settled. The riparian owner's title extends to the low-water mark. The state owns the bed of navigable waters below the low-water mark in trust for the people for public uses, * * *.

*State v. Slotness,* 289 Minn. 485, 486, 185 N.W.2d 530, 532 (Minn.1971) (citations omitted).

■ On the question of ownership of the riparian land made by deposit of dredge spoils, the parties rely on alternative characterizations of the process by which the land was "made." Soo Line and RLCA would have us treat the creation of the land as an "accretion." According to the doctrine of accretion, all "made lands" created as a result of "small and imperceptible degrees * * * shall go to the owner of the land adjoining." 2 William Blackstone, *Commentaries* *261–62. The Supreme Court has de-

fined this as a change that is not perceptible when it takes place. "[T]hough the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." *Philadelphia Co. v. Stimson,* 223 U.S. 605, 624, 32 S.Ct. 340, 346, 56 L.Ed. 570 (1912) (quoting *County of St. Clair v. Lovingston,* 90 U.S. (23 Wall.) 46, 68, 23 L.Ed. 59 (1874)). This court, along with the majority of American jurisdictions,[2] has held that the rights of the riparian owner include the "right to accretions * * * formed or produced in front of his land by the action * * * of the water." *Lamprey v. Metcalf,* 52 Minn. 181, 198, 53 N.W. 1139, 1143 (1893).

Further, there is a considerable body of caselaw nationally holding that accretions need not be by natural causes. In *Bd. of Trustees of the Internal Improvement Trust Fund v. Sand Key Associates, Ltd.,* 512 So.2d 934 (Fla.1987), the Florida Supreme Court said, "[T]he law, as it has developed, does not distinguish between natural and artificial accretions * * *." *Id.* at 937. Similarly in *Lakeside Boating & Bathing Inc. v. Iowa,* 344 N.W.2d 217 (Iowa 1984), the Iowa Supreme Court held that "[a] riparian owner's right to accreted land is the same whether the accretion occurs from natural causes or from artificial means * * *." *Id.* at 220.[3]

■ In contrast, Pepin, the intervenors, and the state argue that the process is one of "avulsion," another theory of riparian law. Avulsion is defined as any change that is "[a] sudden and perceptible loss or addition to land by the action of water, or a sudden change in the bed or course of a stream." Black's Law Dictionary 137 (6th ed. 1990). As a general rule, riparian land made by avulsion does not change the underlying ownership, *State v. Longyear Holding Co.,* 224 Minn. 451, 29 N.W.2d 657 (1947); *Hanson v. Rice,* 88 Minn. 273, 92 N.W. 982 (1903), and

---

2. *See, e.g., State v. Gill,* 259 Ala. 177, 66 So.2d 141 (1953); *Lakeside Boating & Bathing, Inc. v. Iowa,* 344 N.W.2d 217 (Iowa 1984); *Baldwin v. Anderson,* 40 Wis.2d 33, 161 N.W.2d 553 (1968); *Krumwiede v. Rose,* 177 Neb. 570, 129 N.W.2d 491 (1964); *De Simone v. Kramer,* 77 Wis.2d 188, 252 N.W.2d 653 (1977).

3. *See also California ex.rel. State Lands Commission v. United States,* 457 U.S. 273, 102 S.Ct. 2432, 73 L.Ed.2d 1 (1982); *Arkansas v. Tennessee,* 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638 (1918); *County of St. Clair v. Lovingston,* 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874); *State v. Gill,* 259 Ala. 177, 66 So.2d 141 (1953); *De Simone v. Kramer,* 77 Wis.2d 188, 252 N.W.2d 653 (1977).

so Pepin and the intervenors argue, the State of Minnesota is the owner of the "made" land. They rely principally on *Longyear*, in which this court held the temporary drainage of a lake for purposes of allowing mining of the lake bed did not grant the riparian owners an ownership interest in the land thus created. *Longyear*, 224 Minn. at 468–69, 29 N.W.2d at 667. Pepin and the intervenors urge that the land created by the dredging did not appear as the result of "small and imperceptible changes," but was the result of a sudden and abrupt action, akin to the temporary draining of the lake in *Longyear*.

No Minnesota case appears to be precisely on point. Further, the creation of riparian land on the banks of the Mississippi River through the deposit of dredge spoils does not fit neatly into the doctrine of either "accretion" or "avulsion." Rather, what is at issue here is the creation of land, over a period of almost 20 years, by regular, but intermittent man-made activity. It was neither "small and imperceptible" nor "sudden and abrupt," but gradual and periodic. Who, then, should be sanctioned as the owner of the property?

We find our answer in the strong common law tradition of Minnesota in support of the riparian owner's access to the water. This right of access has been called by this court, the "principal value of the land," upon which all others depend. *Lamprey*, 52 Minn. at 197, 53 N.W. at 1142. Were we to adopt the theory of Pepin, the intervenors, and the state, we would negate that principal value by inserting between the land of the riparian owner and the water, a strip of property owned by someone else. The property at issue here was created by the dredging activity of a governmental entity in order to implement its legal right to keep the shipping channel open. The riparian owner did not request the dredging and very likely had no ability to prohibit it. Yet under Pepin's theory, these unsolicited actions of a third party would deprive the riparian owner of the "principal value" of its property. We conclude that such an outcome would be both unfair and inconsistent with our previous rulings, and therefore hold that Soo Line is the owner of the riparian property at issue.

■ We next consider the question of whether Pepin has abandoned two undeveloped streets, platted as Main and Reed streets. This court has defined the elements of abandonment of a public street in *Halverson v. Village of Deerwood*, 322 N.W.2d 761 (Minn.1982). Combining the holdings in *Village of Newport v. Taylor*, 225 Minn. 299, 30 N.W.2d 588 (1948), and *City of Rochester v. North Side Corp.*, 211 Minn. 276, 1 N.W.2d 361 (1941), the court established the five elements necessary to prove abandonment of public, dedicated property:

> [A]n estoppel arises where there is long-continued *nonuser* by the municipality, together with the *possession by private parties in good faith* and in the belief that its use as a street has been abandoned, and the erection of *valuable improvements* thereon without objection from the municipality, which has knowledge thereof, so that to reclaim the land would result in *great damage* to those in possession. [T]here must * * * be some *affirmative or unequivocal act* of the municipality which * * * induced a third person reasonably to believe in and to rely upon such act as * * * an intent in fact to abandon the street * * *.

*Halverson*, at 767 (emphasis added) (citations omitted). The only element of abandonment at issue in this case is whether there were "affirmative or unequivocal acts" necessary to demonstrate the municipality's intent to abandon the undeveloped streets.

■ We have always been reluctant to grant such vacation of a public street without something more than mere nonuse, because platted and dedicated streets are not always utilized immediately after such dedication, but are reserved for future use as the needs of the municipality may change. *Parker v. City of St. Paul*, 47 Minn. 317, 319, 50 N.W. 247, 248 (1891). Thus, mere implied abandonment is not enough for this court to eliminate the rights of the municipality. *See, e.g., Village of Newport v. Taylor*, 225 Minn. 299, 305–06, 30 N.W.2d 588, 592–93 (1948) (no abandonment of a street that had been platted but simply never used); *Rein v. Town of Spring Lake*, 275 Minn. 79, 82–83, 145 N.W.2d 537, 540 (1966) (the street, as plat-

ted, was on terrain which was not adaptable to street use, but not considered abandoned).

RLCA identifies several distinct types of actions that it considered "unequivocal or affirmative acts" sufficient to demonstrate abandonment. They are: (1) the issuance of various permits, including those necessary to create and maintain the marina and harbor, to sell beverages and food on the premises and to use the beach property as a campground and harbor; (2) the encroachment of a building on what would be an extension of Main Street; (3) the payment of taxes by Soo Line on the building on the property and on the property itself, and (4) the request by Pepin that the county take over maintenance of Water Street. RLCA asks this court to consider these acts as "unequivocal or affirmative acts" indicative of Pepin's abandonment of the streets.

■ We review each act separately. The licenses relied upon by RLCA and the Soo Line as evidence of Pepin's intent to abandon were issued by Goodhue–Wabasha County Community Health Services, the Minnesota Departments of Health and Natural Resources and the U.S. Department of the Army; none were issued by Pepin. RLCA and the Soo Line argue that the township's approval of certain of the licenses convert the decisions into those of the township, thus demonstrating intent to abandon the streets. However, the record does not support this claim, in that it demonstrates only four instances of specific township officer "sign-off" in some thirty years of business activity. It is unclear how the issuance of licenses by governmental entities other than Pepin can in any way be considered acts of the township, much less "affirmative or unequivocal acts." This is especially obvious in light of the fact that the uses permitted by the licenses were in no way related to the undeveloped streets. The issuance of business licenses by entities other than the municipality that platted the streets is not an "unequivocal or affirmative" act of the kind necessary to prove abandonment.

■ Second, RLCA states that a building on the property, for which taxes have been collected since 1988, encroaches onto the Main Street extension, thus making the street unusable for public transportation.

However, the record reveals that the actual encroachment is only some 6 to 8 feet onto a street that measures 60 feet in width. This court has held that abandonment would not be determined by mere nonuse, nor will nonuse, coupled with failure to remove obstructions erected by abutting property owners or others, constitute abandonment. *Village of Newport,* 225 Minn. at 305–06, 30 N.W.2d at 592. Thus, even though the building may minimally obstruct the street access, such imposition, by itself, does not meet the requirements to show abandonment.

■ Third, we look to the tax rolls. County records show that Soo Line has, since 1988, paid property taxes to the county on the beach property and the riparian upland property of record, as well as on the building which encroaches onto the extension of Main Street. However, the mere assessment and collection of taxes has not been deemed a sufficient indication of intent to abandon, absent other affirmative acts. *See Rein,* 275 Minn. at 81–85, 145 N.W.2d at 539–41.

■ Finally, RLCA argues that the township has allowed the county to take over maintenance of a road that now separates the disputed street sections from the township itself. Like the issuance of business licenses by other government entities, county maintenance of a road, other than that argued to be abandoned, appears to have no bearing on the questions of abandonment.

■ This court has held that the acts of a municipality must be "affirmative and unequivocal" in nature and indicative of an intent to abandon. While the record here demonstrates that Pepin did not develop the platted streets, the other actions identified as evidence of the township's abandonment simply do not rise to the level of "affirmative and unequivocal acts" required by *Halverson.* Absent the identification of such acts showing an intent to abandon the streets in dispute, we hold that the streets have not been abandoned.

Affirmed.