Thomas **BERREMAN**, Appellant,

v.

**WEST PUBLISHING COMPANY,**
**et al., Respondents.**

No. CX–00–110.

Court of Appeals of Minnesota.

Aug. 1, 2000.

Review Denied Sept. 26, 2000.

Michael C. McCarthy, William Z. Pentelovich, Maslon Edelman Borman & Brand, LLP, Minneapolis; and Thomas J. Lyons, Thomas Lyons & Associates, P.A., Maplewood; and Thomas J. Lyons, Jr., Consumer Justice Center, P.A., Maplewood, for appellant.

Patricia A. Bloodgood, Susan E. Ellingstad, Lockridge Grindal Nauen P.L.L.P., Minneapolis, for respondents.

Considered and decided by RANDALL, Presiding Judge, LANSING, Judge, and WILLIS, Judge.

## OPINION

LANSING, Judge.

Thomas Berreman appeals from summary judgment dismissing his action against West Publishing Company and three West directors (collectively "West"). Berreman alleged three causes of action: breach of fiduciary duty, unfairly prejudicial conduct in violation of Minn.Stat. § 320A.751, subd. 1(b)(3) (1994), and fraud. Berreman's claims were based on his assertion that West had a duty to disclose to him, before Berreman retired from West and sold his stock back to the company in June 1995, that three of West's directors had begun to consider the sale of West and had engaged an investment-banking firm to explore West's options. On cross-motions for summary judgment, the district court granted summary judgment to West on all of Berreman's claims. Because West did not breach a fiduciary duty, unfairly prejudice Berreman within the meaning of Minn.Stat. § 302A.751, subd. 1(b)(3), or commit fraud, we affirm.

## FACTS

The facts are undisputed. In April 1995, Thomas Berreman, a 25–year employee of West Publishing Company, told West's Chief Executive Officer, Dwight Opperman, that he intended to retire effective June 1, 1995. Berreman had worked for West's lawschool division since 1970. West promoted him to assistant manager of the division in 1977 and to division head in 1992.

Beginning in 1974, Berreman bought West stock through a stock-option program for high-level managers and sales representatives that granted options at Dwight Opperman's discretion. In June 1995, Berreman owned 1,600 shares of stock. Berreman bought his stock subject to a written agreement for purchase, sale,

and resale, which provided that if he decided to sell his stock or in the event of his death, incompetency, or termination of employment, West could exercise an option to repurchase the stock at book value. The agreement placed no ultimate limitation on Berreman's ability to sell his stock outside the company, but historically West had always exercised its option to redeem its stock. When Berreman told Dwight Opperman of his plans to retire, Opperman looked at Berreman's records and told him that he should "do all right."

Berreman's last day at West was May 31, 1995. On June 1, 1995, with Berreman's authorization, West redeemed Berreman's stock at the current book value of $2,088.90 per share and paid off a bank loan secured by the stock. On June 15, 1995, Chief Financial Officer Grant Nelson gave Berreman a check for approximately $2.8 million.

As of May 31, 1995, West had about 200 employee shareholders, 25 non-employee shareholders, and 328,908 shares outstanding. Dwight Opperman, Nelson, and board president Vance Opperman, in addition to being directors, were each shareholders. Together they held 23 percent of West's outstanding shares. Until its sale to Thomson Corporation in 1996, West was a privately held corporation. And until West announced the possibility of a sale in August 1995, West directors had publicly expressed their commitment to remaining privately held.

During 1994 and 1995, West was facing an increasingly competitive legal publications market. Two of West's competitors, Mead Data, owner of Lexis–Nexis, and Prentice Hall Law & Business, merged into international publishing companies in 1994. That same year West received unsolicited materials on possible mergers from investment-banking firms Goldman–Sachs and A.G. Edwards, which included information about Thomson Corporation. In response to the increasingly competitive conditions, West's board increased its acquisition fund from $70 million to $300 million in October 1994.

During the second week of May 1995, while on vacation, Nelson reflected on the future of West in light of the changing legal-publications market. Nelson was concerned about West's future given increasing competition, changing technology, and pending antitrust investigations. Nelson concluded that rather than making an acquisition, West should consider being acquired or entering into a joint venture.

On May 15, 1995, Nelson met with Dwight Opperman, who listened to Nelson's concerns and told him, "I think you may be right." Nelson and Dwight Opperman met with Vance Opperman the next day, and the three decided to engage A.G. Edwards to explore West's options. Nelson called Ray Kalinowski at A.G. Edwards the same day and told him that West wanted advice on the company's future financial options, including a possible sale of the company. On May 17, 1995, A.G. Edwards representatives met with the West directors. The directors authorized A.G. Edwards to retain another investment-banking firm if necessary.

The West board met on May 23, 1995. During that meeting, the board again addressed its potential acquisitions and authorized A.G. Edwards to explore financing options beyond West's local bank. The board did not discuss the possibility of selling the company. This meeting was the last board meeting before Berreman's June 1 retirement.

On August 28, 1995, A.G. Edwards made a presentation to the West board outlining four options: recapitalization, public offering, status quo, and sale. The board engaged A.G. Edwards and Goldman–Sachs to advise and assist West in evaluating its options and authorized West management to take necessary steps, including contacting potential buyers and developing acquisition proposals.

On August 29, 1995, West announced to its employees and to the public that it had

engaged investment bankers and was considering alternative financial options including public offering, entering into a joint venture, joining a strategic partner, recapitalization, sale, or any other available option. In September 1995, West sent invitations for bids to 45 potential purchasers. The bids were due by February 1996, and West eventually received four bids, including one from Thomson Corporation. West accepted Thomson Corporation's bid, and the companies entered into a merger agreement on February 25, 1996. After a shareholder vote and review by the Department of Justice, West concluded the sale to Thomson in June 1996. Thomson paid $10,445 per share to acquire West, about five times the amount Berreman received when he sold his stock back to the company in June 1995. Berreman's action against West followed.

## ISSUES

I. Did the district court err by granting summary judgment to West on Berreman's fiduciary-duty claim?

II. Did the district court err by granting summary judgment to West on Berreman's claim of unfairly prejudicial conduct under Minn.Stat. § 302A.751, subd. 1(b)(3) (1994)?

III. Did the district court err by granting summary judgment to West on Berreman's fraud claim?

## ANALYSIS

### I

 This court reviews appeals from summary judgment to determine if there are any genuine issues of material fact and if the district court erred in its application of the law. *Reads Landing Campers Ass'n, Inc. v. Township of Pepin*, 546 N.W.2d 10, 13 (Minn.1996). When the facts are not disputed, the only questions before this court are questions of law, which we review de novo. *Id.* Whether a fiduciary duty has been breached generally is a question of fact. *Miller Waste Mills,*

*Inc. v. Mackay*, 520 N.W.2d 490, 496 (Minn.App.1994), *review denied* (Minn. Oct. 14, 1994). Materiality is a question of both fact and law. *Connelly v. General Med. Corp.*, 880 F.Supp. 1100, 1113 (E.D.Va.1995). Thus, summary judgment on Berreman's fiduciary-duty claim "is only appropriate where no rational finder of fact could conclude" that West breached a fiduciary duty to Berreman by failing to disclose material facts. *Id.* (citation omitted).

### Common Law Fiduciary Duty

At common law, the shareholders in a close corporation owe one another a fiduciary duty. *See Fewell v. Tappan*, 223 Minn. 483, 494, 27 N.W.2d 648, 654 (1947); *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn.App.1992) (*Pedro II*), *review denied* (Minn. Oct. 20, 1992); *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn.App.1984). Courts impose the fiduciary duty because they find that close corporations are really more like "partnership[s] in corporate guise." *Westland Capital Corp. v. Lucht Eng'g Inc.*, 308 N.W.2d 709, 712 (Minn. 1981); *see also Fewell*, 223 Minn. at 494, 27 N.W.2d at 654 (concluding that two men who co-owned corporation and agreed not to sell stock without other man's consent, "stood in the relationship of copartners"); *Pedro II*, 489 N.W.2d at 801 ("relationship among shareholders in closely held corporations is analogous to that of partners"); *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 512 (1975) ("Commentators and courts have noted that the close corporation is often little more than an 'incorporated' or 'chartered' partnership.").

### Attributes of Close Corporation

 Courts generally identify common law close corporations by three characteristics: (1) a small number of shareholders; (2) no ready market for corporate stock; and (3) active shareholder participation in the business. *Donahue*, 328 N.E.2d at 511; *see also Westland*, 308 N.W.2d at 712 (describing close corpora-

tions). In addition, dividends are rarely distributed in a close corporation. *Westland*, 308 N.W.2d at 712. Rather, "shareholders derive their income mainly from salaries and perquisites." *Id.*

In May 1995, West exhibited characteristics of a close corporation. First, West was not publicly traded; thus, there was no ready public market for its stock. *See Sundberg v. Lampert Lumber Co.*, 390 N.W.2d 352, 354, 357 (Minn.App.1986) (no ready public market for stock that was never registered for sale and was not traded on any securities market), *review denied* (Minn. Sept. 22, 1986), *superseded by statute on other grounds*, Minn.Stat. § 302A.751, subd. 2 (1994). This court has recognized the lack of a public market as the dominant characteristic of a common law close corporation. *Sundberg*, 390 N.W.2d at 357 (citing F.H. O'Neal, *Close Corporations* § 1.02 (2d ed.1971)). The legislature has also recognized the significance of this factor in providing remedies. As initially written, the MBCA allowed a buy-out remedy only to shareholders in a closely-held corporation, but a 1994 amendment to the MBCA allows a buy-out remedy for shareholders of all corporations that are not publicly held. *See* 1994 Minn. Laws, ch. 417, § 9. Additionally, West offered its stock only to high-level managers and sales people at Dwight Opperman's discretion. The lack of a public market for West stock, combined with the managerial role West's shareholders occupied, supports the characterization of West as a common-law close corporation.

Second, the rationale for distinguishing close corporations from other corporations supports the characterization of West as a close corporation. Courts have recognized that because majority shareholders of a close corporation can deny minority shareholders income from their investment, minority shareholders are in a vulnerable position. *See, e.g., Westland*, 308 N.W.2d at 712. Majority shareholders can "freeze out" minority shareholders by refusing to employ them, refusing to declare any dividends, siphoning off profits through excessive salaries to officers or directors or self-dealing leases and contracts, selling business assets to majority shareholders or their affiliates, forcing redemption of shares, or "cashing out" minority shareholders at an unfairly low price through a merger. Daniel S. Kleinberger, *Why Not Good Faith? The Foibles of Fairness in the Law of Close Corporations*, 16 Wm. Mitchell L.Rev. 1143, 1152 (1990). In combination with the lack of a public market for the shares, these actions effectively hold the minority shareholders' investments hostage. That West's corporate structure would have allowed this type of "freeze out" supports its characterization as a close corporation.

On the other hand, West's 200 shareholders far exceed the number of shareholders in any corporation that Minnesota courts have recognized as a close corporation. To categorize West as a close corporation under Minnesota common law would substantially extend the definition's numerical boundaries. Berreman argues that because 94% of the stock was held by employees and subject to repurchase agreements, West's decision-making was concentrated in only a few individuals, and West's numerical structure should be analyzed from that viewpoint. These arguments have persuasive force and a fact-finder could draw inferences that would credit Berreman's arguments. Because we are reviewing a summary judgment against Berreman's claims, he is entitled to review in a light most favorable to the evidence supporting his claims, and thus we assume for purposes of our analysis that West may be categorized as a close corporation. *See Martin v. Spirit Mountain Recreation*, 566 N.W.2d 719, 721 (Minn.1997) (reviewing court must view evidence in light most favorable to party opposing motion).

### Effect of Minnesota Business Corporation Act on Common Law Fiduciary Duty

West argues that even if it could have been characterized as a common law

close corporation, the legislature abrogated the common law definition by enacting the Minnesota Business Corporations Act (MBCA), Minn.Stat. §§ 302A.01–.917 (1994 & Supp.1995). First, the MBCA did not completely abrogate the common law fiduciary duty in the context of a close corporation. *See Pedro II*, 489 N.W.2d at 802 (affirming judgment based on breach of fiduciary duty). In fact, the MBCA specifically recognizes "the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner." Minn.Stat. § 302A.751, subd. 3a (1994). But, significantly, the MBCA defines closely held corporations as those with 35 or fewer shareholders. Minn.Stat. § 302A.011, subd. 6a (1994). West asserts that adoption of this definition abrogates common law fiduciary-duty claims involving companies with more than 35 shareholders. Berreman, in turn, argues that a statutory closely held corporation is distinguishable from the common law close corporation and that the common law close corporation survives for purposes of determining fiduciary duties.

 Although West's abrogation argument has merit, we conclude for several reasons that it does not prevail. Statutory law is presumed to be consistent with the common law. *Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 377 (Minn.1990). "If statutory enactment is to abrogate common law, the abrogation must be by express wording or necessary implication." *Id.* Nothing in the MBCA specifically abrogates the common law definition of a close corporation. Berreman submitted the affidavit of a law school professor, who stated that he drafted the 1983 amendment that added the closely held corporation definition to the statute, and that the amendment was not intended to abrogate the common law remedies. The affidavit indicates that the professor testified that the 1983 amendments to section 302A.751 were not intended as a ceiling to limit fiduciary duties, but solely as a floor to insure that shareholders in "closely held corporations"

would be automatically entitled to the doctrines referred to in Minn.Stat. § 302A.751, subd. 3a.

The reporter's notes tend to support the affidavit, providing that the "closely held corporation" definition is "used primarily in connection with" the buy-out remedy of Minn.Stat. § 302A.751, subd. 2. Minn.Stat. Ann. § 302A.011 (West 1985) (Reporter's Notes 1982–84). It is also significant that application of the common law definition of close corporation in the context of an action for breach of fiduciary duty does not conflict with the MBCA. The fiduciary-duty action is distinct and separate from the remedies provided by the MBCA.

West argues that the MBCA abrogates the common law definition of a close corporation by necessary implication because the legislature intended the MBCA to eliminate the "confusion and frustration in the modern business world for shareholders, directors, officers, creditors, governmental agencies, lawyers, and the courts." Report to the Senate by Advisory Task Force on Corporation Law (1981) (Advisory Task Force Report), *reprinted in* Minn. Stat. Ann. § 302A.001 (West Supp.2000). But the task force report focuses on the confusion that was caused by the predecessor to the MBCA, which contained "needlessly structured formalit[ies]" and did not allow "the use of more informal and flexible procedures that are available in other states." *Id.* Thus, the changes to the statute made it easier for corporations to *form and operate.*

Although the task force enumerated the confusing problems with the old business-corporations statute, it did not mention the common law shareholder remedies. Instead the task force focused on the predecessor statute's narrow remedy of dissolution and the unwillingness of courts to invoke so extreme a measure. *Id.* The purpose of the new dissolution section, Minn.Stat. § 302A.751, was to give statutory authority to grant a broad range of equitable remedies other than dissolution. Minn.Stat. Ann. § 302A.751 (West 1985)

(Reporter's Notes 1981). Subsequent amendments to the MBCA have broadened shareholders' rights under the statute. *See PJ Acquisition Corp. v. Skoglund*, 453 N.W.2d 1, 18 (1990) (change of statutory language from "persistently unfair" to "unfairly prejudicial" intended to "liberalize the remedies available"); *Wessin v. Archives Corp.*, 581 N.W.2d 380, 387–88 (Minn.App.1998) (recounting history and purpose of amendments to MBCA), *rev'd on other grounds*, 592 N.W.2d 460 (Minn. 1999).

This case is distinguishable from *Sundberg v. Lampert Lumber Co.*, in which this court held that statutory limitations on the buy-out remedy of Minn.Stat. § 302A.751, subd. 2, abrogated any common law buy-out remedy. 390 N.W.2d at 357. In that case, the common law remedy directly conflicted with the statutory limitations. *Id.* No such conflict exists in this case. Because we can discern no clear legislative intent to abrogate the common law, we conclude that the common law definition of a close corporation continues to apply for purposes of determining fiduciary relationships.

### Scope of Common Law Fiduciary Duty

We turn next to the scope of the common law fiduciary duty. While it is well established that shareholders in a close corporation owe a fiduciary duty to one another, the scope of the duty has never been well defined. In *Donahue v. Rodd Electrotype Co.*—often cited as a leading case on fiduciary duty in the close corporation context—the Massachusetts Supreme Court held that "stockholders in a close corporation owe[d] one another substantially the same fiduciary duty in the operation of the enterprise that partners owe one another." 328 N.E.2d at 515 (footnote omitted). The court described the duty as one of "utmost good faith and loyalty" and went on to hold that a corporation that buys shares from one shareholder must offer to buy shares from all other shareholders at the same rate. *Id.* at 515, 518. This has since been called the equal-oppor-

tunity rule. *Donahue* is probably the broadest statement of the fiduciary duty in the close-corporation context. Even the Massachusetts Supreme Court later qualified its holding by recognizing that there may be legitimate business reasons for treating shareholders differently. *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657, 663 (1976) (establishing that when corporation demonstrates legitimate business interest, plaintiff, to succeed on fiduciary claim, must show less harmful alternative to achieve that interest).

"Freeze-out" situations are the classic situations in which courts have found and enforced fiduciary duties. Thus, courts have found breaches of fiduciary duty based on majority shareholders' preferential use of corporate assets. *See Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217, 221 (1989) (stating that majority shareholders breach fiduciary duty when they use their control to give themselves benefits not enjoyed by the minority); *Tillis v. United Parts, Inc.*, 395 So.2d 618, 619 (Fla.Dist.Ct.App.1981) (recognizing that allowing only majority shareholder to sell shares to corporation constitutes preferential distribution of corporate assets and is inconsistent with fiduciary duty); *Comolli v. Comolli*, 241 Ga. 471, 246 S.E.2d 278, 281 (1978) (same); *Donahue*, 328 N.E.2d at 518 (same). The courts also have found breaches of fiduciary duties based on majority shareholders' withholding of dividends or exclusion of minority shareholders from employment. *Wilkes*, 353 N.E.2d at 663 (holding that majority shareholders breached fiduciary duty when they terminated 25–percent shareholder from his position as officer, director, and employee).

Minnesota appellate cases addressing fiduciary duty in the close-corporation context, while sparse, are consistent with the fiduciary-duty cases in other jurisdictions. In *Fewell v. Tappan*, the supreme court held that the co-owners of a close corporation owed each other "the highest standard of integrity and good faith in their dealings

with each other." 223 Minn. at 494, 27 N.W.2d at 654. In *Fewell* and *Evans v. Blesi*, the courts found breaches of the fiduciary duty when shareholders threatened or deceived other shareholders into selling their shares. *Fewell*, 223 Minn. at 494, 27 N.W.2d at 654 (co-owner of close corporation breached duty by misleading other owner to believe business was in danger of receivership and thus inducing the other owner to sell his shares for a fraction of their value); *Evans*, 345 N.W.2d at 779–80 (partner in closely held corporation breached fiduciary duty by using intimidating tactics to gain majority share of stock and forcing plaintiff's resignation). In essence, the Minnesota courts have held that shareholders in a close corporation have a duty to deal " 'openly, honestly, and fairly with other shareholders.' " *Pedro II*, 489 N.W.2d at 801 (quoting *Evans*, 345 N.W.2d at 779).

The Minnesota cases have not addressed whether the fiduciary duty in a close corporation context includes a duty to disclose. The supreme court has, however, ruled that "[o]ne who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts." *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 420, 196 N.W.2d 619, 622 (1972). And this court has applied the duty to disclose material facts in the analogous partnership context. *See Appletree Square I Ltd. Partnership v. Investmark, Inc.*, 494 N.W.2d 889, 892 (Minn.App.1993) (holding partners had duty to disclose to their other partners existence of asbestos in office building), *review denied* (Minn. Mar. 16, 1993).

■ Relying on the principles expressed in the Minnesota cases addressing disclosure, we conclude that the fiduciary duties of shareholders in a close corporation include the duty to disclose material information about the corporation. Our holding is consistent with federal cases recognizing the duty to disclose material facts as within the fiduciary duties of shareholders in a close corporation. *Jor-*

*dan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir.1987) (stating that "[c]lose corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts"); *Helms v. Duckworth*, 249 F.2d 482, 487 (D.C.Cir.1957) (stating that "holders of closely held stock in a corporation * * * bear a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information").

### Materiality of Undisclosed Facts

■ The recognition that shareholders in a close corporation have a duty to disclose material facts leads us to the second part of the question: What facts are material and thus fall within the scope of that duty? In the context of the federal securities laws, the U.S. Supreme Court has held that an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983 (1988) (citation omitted). Or, put another way, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32, 108 S.Ct. at 983 (citation omitted). *See also* Black's Law Dictionary 991 (7th ed.1999) (defining material as "[o]f such a nature that knowledge of the item would affect a person's decision-making process"). Materiality, then, depends on the specific facts of each case. *Basic*, 485 U.S. at 239, 108 S.Ct. at 987.

■ In *Basic v. Levinson*, the Supreme Court adopted the probability-magnitude approach for determining whether preliminary merger discussions are material. Under that test, materiality "will depend at any time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of

the event in light of the totality of the company activity." *Id.* at 238, 108 S.Ct. at 987 (citation omitted). Probability should be assessed by evaluating the "indicia of interest in the transaction at the highest corporate levels." *Id.* at 239, 108 S.Ct. at 987. Magnitude should be assessed by considering "such facts as the size of the two corporate entities and of the potential premiums over market value." *Id.*

Addressing circumstances similar to Berreman's, the federal courts have held that tentative or preliminary merger discussions were not material. *See Taylor v. First Union Corp.,* 857 F.2d 240, 243 (4th Cir.1988) (holding discussions between two companies on "the possibility of a future merger" were not material); *Panfil v. ACC Corp.,* 768 F.Supp. 54, 58 (W.D.N.Y. 1991). In *Panfil,* the plaintiff alleged that ACC breached a duty to him by failing to inform him, before he sold his stock, that it intended to approach another company "to facilitate a combination" of the two businesses. 768 F.Supp. at 58. The court found that the facts were not material, reasoning that "there were not 'tentative' discussions" about merger, "there were *no discussions.*" *Id.* The court concluded that "[t]he mere intention to pursue a possible merger at some time in the future, without more, is simply not a material fact * * *. The probability of merger prior to contact with potential suitors—prior to any evidence that a suitor is in any way interested in merger—is too remote." *Id.*

The Supreme Court has recognized, however, that facts that would not be material in the context of a publicly held corporation may be material, and thus subject to the duty to disclose, when they relate to a close corporation:

Since a merger in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high.

*Basic,* 485 U.S. at 238, 108 S.Ct. at 987 (citation omitted). Consistent with this analysis, the Seventh Circuit Court of Appeals has held that a close corporation's initial decision to seek buyers may be material. *Jordan,* 815 F.2d at 434 (reasoning that a jury could conclude "that the board's decision * * * to seek a buyer * * *—coupled with the fact that at least one putative buyer thought Duff & Phelps worth $50 million * * *—was material"); *Michaels v. Michaels,* 767 F.2d 1185, 1197 (7th Cir.1985) (concluding that "a jury could reasonably find that Littlejohn's agreement to contact prospective buyers on behalf of Hyman–Michaels was material").

### Application of Probability–Magnitude Test to Undisclosed Facts

Applying the probability-magnitude test to this case, we hold that the facts known to West at the time Berreman resigned were immaterial as a matter of law. By the end of May 1995, Nelson, Dwight Opperman, and Vance Opperman had decided to explore options for the future of West including a possible sale, and they had hired an investment-banking firm to investigate West's options. West, however, had made no decision to solicit bids for the sale of West, much less initiated discussions with any potential buyers. The federal courts have been reluctant to find materiality in the absence of evidence that the corporation engaged in discussions with potential buyers. Even in the close-corporation context, the Seventh Circuit has gone no further than to say that a corporation's decision to seek a buyer may be material. We agree that tentative, speculative discussions about merger are not material.

Berreman urges that the early discussions among the West directors about the possibility of merger should be found material because the magnitude of any potential merger was substantial. West had

always been a privately held corporation, and until August 1995, its directors were vocally committed to being privately held. That any merger would have been such a sharp departure from West's long history of being privately held supports the magnitude of the merger discussions. But the magnitude of the discussions does not overcome the low probability that the merger would ever occur. The initial discussions were among West's top directors, which supports probability. But even these three directors had decided only to explore West's financial options. Thus, the discussions were not material.

## II

Berreman next claims that West's conduct was unfairly prejudicial to him and that he is thus entitled to equitable relief under the MBCA. *See* Minn.Stat. § 302A.751, subd. 1(b)(3) (1994). The district court did not directly address Berreman's theory that West's failure to disclose the initial merger discussions was unfairly prejudicial under section 302A.751. West argues that the district court implicitly rejected this theory based on its conclusion that there were no material facts that would trigger a duty to disclose. But Berreman contends that materiality is not dispositive of the analysis under section 302A.751 and that the district court should have separately considered his statutory claim.

■ We agree that materiality is not an element of unfairly prejudicial conduct under section 302A.751, subd. 1(b)(3), and thus Berreman's statutory claim warrants separate consideration. We believe, however, that the circumstances would be rare when a director's failure to disclose immaterial facts would constitute unfairly prejudicial conduct under the statute. We also conclude that because the issue has been fully briefed, we need not remand to the district court for a specific determination on this issue. *Holen v. Minneapolis–St. Paul Metro. Airports Comm'n*, 250 Minn. 130, 135, 84 N.W.2d 282, 286 (1957) (stat-ing that appellate court may address issues when fully briefed and no possible advantage or disadvantage to either party in not having prior ruling).

The MBCA allows the courts to grant equitable relief to a shareholder in a corporation that is not publicly held when the directors of that corporation have "acted in a manner unfairly prejudicial" toward that shareholder in his capacity as shareholder or director. Minn.Stat. § 302A.751, subd. 1(b)(3). The term "unfairly prejudicial" should be liberally construed. Minn.Stat. Ann. § 302A.751 (West 1985) (Reporter's Notes 1982–84); *McCallum v. Rosen's Diversified, Inc.*, 153 F.3d 701, 703 (8th Cir. 1998). The statute does not define the term, however, and its plain meaning is not apparent.

■ Breaches of fiduciary duty are probably unfairly prejudicial within the meaning of section 302A.751, subd. 1(b)(3). Section 302A.751, subd. 3a, specifically directs that courts, in deciding whether to grant equitable relief, should consider the "duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner." Minnesota courts' application of this section is consistent with that understanding. *See Pedro II*, 489 N.W.2d at 802–03 (affirming judgment on fiduciary-duty claim along with award of equitable relief under Minn.Stat. § 302A.751). Unfairly prejudicial conduct also is distinct from fraudulent or illegal conduct, which is addressed elsewhere in the statute. *See* Minn.Stat. § 302A.751, subd. 1(b)(2) (1994) (court may grant equitable relief based on directors' fraudulent or illegal conduct); Minn.Stat. § 645.17 (1994) (statute must be considered as a whole to harmonize and give effect to all provisions).

. Seven other states refer to "unfair prejudice" or "unfairly prejudicial" in their business corporation statutes. *See Kiriakides v. Atlas Food Sys. & Servs., Inc.*, 527 S.E.2d 371, 386 (S.C.Ct.App.2000) (listing Alaska, California, Minnesota, Missouri,

Montana, Wisconsin, and Wyoming in addition to South Carolina). Other states follow the Model Business Corporations Act by referencing "oppressive conduct." O'Neal, *supra,* § 9.29, at 131–32. Only South Carolina, which has a statute that references both oppressive and unfairly prejudicial conduct, has explicitly defined unfairly prejudicial. According to the South Carolina Court of Appeals, oppressive or unfairly prejudicial conduct is

1) A visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely; or

2) A breach of fiduciary duty of good faith and fair dealing; or

3) Whether the reasonable expectations of the minority shareholders have been frustrated by the actions of the majority; or

4) A lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or

5) A deprivation by majority shareholders of participation in management by minority shareholders.

*Kiriakides,* 527 S.E.2d at 387–88.

*Kiriakides*'s definition of oppressive or unfairly prejudicial conduct is consistent with other jurisdictions' application of oppressive conduct. The courts have primarily defined "oppressive" as one of the first three prongs of the *Kiriakides* definition. *See* O'Neal, *supra,* § 9.29, at 132 (collecting cases). The most often applied definition of oppressive asks whether the actions of majority shareholders have frustrated a minority shareholder's reasonable expectations. *See id.*

We conclude that the reasonable-expectations approach is most consistent with the Minnesota legislature's intent in adopting the unfairly prejudicial language. The advisory task force indicated that one of its goals was to draft a law that would "provide, as rules, all of the provisions that would normally be expected to result from associative bargaining if all parties were represented by counsel, coupled with the expressed flexibility to vary those rules whenever necessary to reflect the actual associative bargain." Advisory Task Force Report, *supra.* Further, the statute explicitly directs the courts to consider the expectations of shareholders in a closely held corporation. Minn.Stat. § 302A.751, subd. 3a. Although this section of the statute does not directly apply in this case, it demonstrates the importance that the legislature has placed on shareholder expectations.

We conclude that unfairly prejudicial conduct under Minn.Stat. § 302A.751, subd. 1(b)(3), is conduct that frustrates the reasonable expectations of shareholders in their capacity as shareholders or directors of a corporation that is not publicly held or as officers or employees of a closely held corporation.

West argues that the buy-back agreement compels a conclusion that West's conduct did not frustrate Berreman's reasonable expectations. *See* Minn. Stat. § 302A.751, subd. 3a (written agreements between the parties are presumed to represent their reasonable expectations). We disagree that the repurchase terms are dispositive of reasonable expectations in all circumstances. Berreman's reasonable expectations would not have been frustrated if the buy-back agreement had been triggered by events outside Berreman's control, i.e., if West terminated his employment. In this case, however, Berreman chose the course of action that triggered the buy-back agreement, i.e., retirement, and contends that he would not have retired if West had disclosed the merger discussions to him. Under these circumstances the presumed reasonableness of the buy-back agreement is not dispositive.

Nonetheless, we conclude that West's conduct did not frustrate Berreman's reasonable expectations as a shareholder. In a typical close corporation, a

shareholder may have an expectation of a job, a share of corporate earnings, and a place in management. *Pedro II,* 489 N.W.2d at 802; *see also Balvik v. Sylvester,* 411 N.W.2d 383, 387 (N.D.1987). At-will employees who are allowed to buy stock subject to a buy-back-on-termination agreement may have lower expectations. *See Coleman v. Taub,* 638 F.2d 628, 636 (3d Cir.1981) (holding that shareholder who signed buy-back agreement bargained for right to be shareholder only while employed). Berreman did not have a reasonable expectation that he would be informed of any speculative discussions West's directors had about the financial future of West. *See Balvik,* 411 N.W.2d at 387 (N.D. 1987) (reasoning that "[d]isappointment alone should not necessarily be equated with oppression") (citation omitted). Therefore, West's conduct was not unfairly prejudicial to Berreman, and he is not entitled to equitable relief under the MBCA.

### III

Berreman finally claims that West committed fraud by failing to disclose the initial merger discussions and actions the West directors took to explore financial options. Berreman alleges no affirmative misrepresentations and concedes that silence does not constitute fraud in the absence of a duty to speak. *See L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 380 (Minn.1989) (recognizing that nondisclosure amounts to fraud only if legal obligation to communicate exists). Because West had no affirmative duty to disclose at the time Berreman retired or when West redeemed his stock, West is entitled to judgment as a matter of law on Berreman's fraud claim.

### DECISION

As a matter of law West did not breach a fiduciary duty, unfairly prejudice Berreman within the meaning of Minn.Stat. § 302A 751, subd. 1(b)(3), or commit fraud.

Accordingly, we affirm summary judgment for West on each of Berreman's claims.

**Affirmed.**